Argued April 28, 1955, reversed and remanded June 27, 1956

# RADCLIFFE ET UX v. FRANKLIN NATIONAL INSURANCE CO. ET AL

298 P. 2d 1002

[ 1 ]

*Thomas H. Tongue, III,* argued the cause for appellants. On the brief were Hicks, Davis & Tongue, Portland, and Arthur W. Schaupp, Klamath Falls.

*Howard K. Beebe,* Portland, argued the cause for respondents. With him on the brief were Maguire, Shields, Morrison & Bailey, Portland.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN, LUSK, LATOURETTE and PERRY, Justices.

ROSSMAN, J.

This is an appeal by the plaintiffs from a judgment which the circuit court entered in favor of the defendants after it had directed the jury to return its verdict for them. The plaintiffs are R. Heber Radcliffe and Ruth H. Radcliffe, husband and wife. The defendants are Franklin National Insurance Company of New York and United National Indemnity Company of New York. The plaintiff, R. Heber Radcliffe, is the insured in a policy of automobile liability insurance, which describes an automobile owned by him, and which was issued October 2, 1947, by the defendants. The latter unite in issuing policies of insurance, but in the policies each limits to specific phases of the undertaking the protection it promises to provide. In the policy before us, the defendant, United National Indemnity Company, insured against claims of bodily and property damage arising out of the operation of Radcliffe's automobile to the extent of $10,000 for injury to or death of one person and to the extent of $20,000 for injury and death in a single accident of more than one person. The undertakings by the Franklin National Insurance Company are not at issue upon this appeal and, accordingly, when we employ the word insurer we will mean the United National Indemnity Company.

July 4, 1948, when the two Radcliffes were in their car and Mrs. Radcliffe was driving, it collided with an automobile carrying Mr. and Mrs. Golden O. Hodges and their two minor children. The collision occurred in Klamath county upon a public thoroughfare. All four of the Hodgeses were injured. August 18, 1949, Mr. and Mrs. Hodges each filed an action in Klamath county against the Radcliffes. Each charged the Radcliffes with negligence and averred that, as a proximate result of the negligence, injury occurred to each of the

two plaintiffs. Mrs. Hodges demanded $50,000 damages and Mr. Hodges $10,000.

The defendant, United National Indemnity Company, pursuant to the terms of the policy of insurance, assumed the defense of the two actions and for that purpose employed Mr. Edwin E. Driscoll, a capable, experienced member of the Oregon bar. Later, the two actions were consolidated for trial and on September 21, 1950, the trial commenced. On the second day of the trial the Hodgeses offered to accept $10,000 in satisfaction of all four claims. The insurer neither accepted nor rejected the offer. September 26, the jury returned a verdict in the amounts of $20,000 and $1,500 for Mrs. Hodges and Mr. Hodges, respectively. After entry of judgments, the United Indemnity Company paid to the Hodgeses $11,500 together with costs and interest. Later, the Radcliffes paid $10,000 to the Hodgeses and thereupon instituted this action for the recovery of that sum of money from the insurance companies. They charged the insurance companies with negligence and bad faith.

The following are the pertinent provisions of the policy of insurance:

> "The unqualified word 'insured' wherever used in coverages includes the named insured and except where specifically stated to the contrary, also includes any person while using the automobile * * * with the permission of the named insured.

>    *    *    *    *    *

> "1 Coverage A—Bodily Injury Liability.

> "To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages, * * * sustained by any person or persons, caused by accident and arising out of the ownership, maintenance or use of the automobile.

"II Defense, Settlement, Supplementary Payments.

"As respects such insurance as is afforded by the other terms of this policy

(a) * * * the company shall

1. defend in his name and behalf any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company shall have the right to make such investigation, negotiation and settlement of any claim or suit as may be deemed expedient by the company;
* * *.
* * * * *

"The limit of bodily injury liability stated in the declarations as applicable to 'each person' is the limit of the company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, including death at any time resulting therefrom, sustained by one person in any accident; * * *.
* * * * *

"When an accident occurs written notice shall be given by or on behalf of the insured to the company * * *.

"If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.
* * * * *

"The insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of accident."

■■ Before going on we pause to observe that the provisions just quoted bound the insurer to ''defend in his (insured's) name and behalf any suit against the insured.'' But no provision couched in terms equally explicit and imperative cast upon the insurer a duty to settle claims. The policy, however, required the insurer ''to pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of liability imposed upon him by law for damages.'' The duty created by those words is not restricted to the payment of judgments, but includes all liabilities imposed ''by law for damages.'' Although the words ''pay'' and ''settle,'' in many instances mean the same, ''settle'' is a term of the accordion type and at times expands its connotation until it becomes a synonym for ''compromise.'' The policy reserves to the company the right to make settlements and imposes upon the insured the duty to assist in effecting them. The provisions which require the insured ''as soon as possible'' to notify the insurer ''when an accident occurs'' and to forward ''immediately'' to the company ''every demand, notice, summons or other process'' may be intended in part to place the insurer in a position to settle promptly claims arising out of automobile accidents.

■ The above provisions of the policy constituted an undertaking upon the part of the insurer to save the insured harmless from liabilities arising out of automobile accidents to the extent of $10,000 and $20,000 and to place the insurer in a superior position to furnish the protection. In protecting the insured, the company could resort to payment, settlement or litigation. Settlement was an optional means, but if not chosen, defense was mandatory. Settlement appears to be an adjunct or corollary of the right to defend. In all events, payment of liabilities imposed by law had to

be made to the extent of $10,000 and $20,000. The policy recognized in the insured no privilege of handling the situation himself. He was required to entrust his protection to the insurer. When an accident happened, the responsibility for the financial result was thrust upon the insurer to the extent of $10,000 and $20,000. If the insured wished the protection afforded by the policy, the latter bound him to "cooperate with the company." It clarified the signification of the word "cooperate" by specifying that the insured must, upon demand of the insurer, "attend hearings and trials" and assist in "effecting settlements, securing and giving evidence." It also cast upon the insured the duty to help with such tasks as "obtaining the attendance of witnesses." Thus the insurer, not the insured, assumed charge the moment an accident occurred.

As a basis for this action, the complaint avers that after the defendants had assumed charge of the defense of the personal injury action it was their duty

"to conduct themselves in respect to such negotiations for compromise and the management of the defense of said claims and actions with a reasonable degree of care, skill and diligence for the protection of plaintiffs' interest, and among other things it became the defendants' duty to report to the plaintiffs seasonably in order to permit the plaintiffs to act on any offers for settlement of said claim, and to conduct said ligations [sic] including appeals with reasonable diligence.

"* * * during the pendency of said trial and while the same was in progress the said plaintiffs, Betty C. Hodges and Golden O. Hodges, by and through their attorney U. S. Balentine, made to defendants, by and through their attorney Edwin E. Driscoll, a firm offer to settle and compromise all of said four actions and claims heretofore alleged against the plaintiffs for the sum of $10,000.00,

lawful money of the United States; that said defendants negligently and carelessly refused to accept said offer or to compromise and to pay the amount thereof.

\* \* \* \* \*

"That said defendants did not in good faith protect the interests of plaintiffs and were negligent in the performance of the duties which they assumed; and wholly failed in good faith in the diligent performance thereof in that they entirely failed to conduct said negotiations for settlement by way of compromise with reasonable skill and diligence; failed to report to plaintiffs the offer of settlement made by Hodges' attorneys in compromise of said claim whereby the defendants herein might have settled said claim by a reasonable compromise within the policy limits and without cost to these plaintiffs; \* \* \*."

The answer of the defendants denies, generally, the above averments, but admits the issuance of the policy of insurance, the occurrence of the collision, the institution of the personal injury actions and the defense thereof by the insurer. It also admits the outcome of the litigation and the payment by the insurer upon the judgments of $11,500 together with costs and interest.

After the parties had rested in the instant case (Radcliffes against the insurance companies), the insurance companies moved for a directed verdict on these grounds: (1) negligence in reaching a decision whether or not to accept a settlement offer is not actionable; (2) the record does not show that the defendants were prompted by bad faith in anything they did; and (3) the record contains no evidence showing that the defendants were guilty of negligence in (a) the investigation of the claims presented by the Hodgeses, (b) the maintenance of the defense, and (c)

the disposition of the settlement offer. A separate motion for a directed verdict in favor of the Franklin National Insurance Company was based upon the ground that the evidence failed to show that it had insured the plaintiffs against any of the matters alleged in the complaint. The motion of that company was granted and from the ruling no appeal was taken. As to the first motion, the trial judge, in sustaining it, expressed the belief that in cases of this kind evidence, in order to establish liability upon the part of the insurer, must establish bad faith. He ruled that failure of the insurer to have notified the Radcliffes of the receipt of an offer of settlement did not establish bad faith and that no other aspect of the case impugned the good faith of the insurer.

As is evident from the foregoing, the plaintiffs (Radcliffes) predicate their case against the insurance companies upon a charge that before the case of the Hodgeses against the Radcliffes was presented to the jury, the Hodgeses had made an offer of settlement and, in the failure of the insurer to have accepted the offer and in its additional failure to have disclosed to the Radcliffes the receipt of the offer, the insurer was guilty of bad faith and negligence.

The plaintiffs-appellants present several issues upon this appeal, but only two of them are essential to a determination of this case. They are: (1) what is the rule which governs cases of this character in which recovery is sought against the insurer for the amount which the insured was compelled to pay in excess of the policy's limits, and (2) once that rule has been determined, would a verdict in favor of the plaintiffs [had the case gone to the jury] have had to be reversed for the absence of sufficient evidence. *Pond*

*v. Jantzen Knitting Mills,* 183 Or 256, 190 P2d 141, and *Chatfield v. Zeller,* 174 Or 59, 147 P2d 222.

Before undertaking to resolve those issues, we will summarize the evidence which reveals the circumstances under which the insurance companies acted when they took the course which the plaintiffs (Radcliffes) say render them liable in this case. The pleadings and the evidence received in the cases of the Hodgeses against the Radcliffes were read into the record of this case. In addition, several witnesses gave testimony which described the extent to which the insurer investigated the Hodgeses' claims and the attention which it bestowed upon the offer of settlement. The following is a synopsis of the facts which were established in the manner just indicated.

July 4, 1948, at 4:30 p. m., the Radcliffes' car was proceeding north and the Hodgeses' south. A short distance ahead of the Hodges car and moving in the same direction was a truck. Between the truck and the Hodges car was an undersize car which the witnesses identified as a Crosley. It was concealed from the Radcliffes by the truck. When the Radcliffe car and the truck were about 90 feet from each other, the Crosley suddenly emerged from behind the truck and proceeded to overtake it. In so doing it entered partly into the lane in which the Radcliffe car was operating. At that juncture Mrs. Radcliffe turned her car sharply to the right and presently her right wheels were running upon the right shoulder of the pavement into which they sank three inches or so. Upon that development a noticeable lurch was felt, according to the witnesses, and thereupon the car veered sharply to the left, that is, to the half of the roadway upon which the Hodges car was approaching. Faced with that crisis, each of the Radcliffes pulled on the steering wheel of their car

in order to prevent a clash with the oncoming Hodges car. Their efforts were unsuccessful and a collision occurred in the lane occupied by the Hodges car. In the meantime, the Crosley car did not revert to its former position behind the truck but continued on its way and overtook the truck. Neither it nor the truck was struck in the perilous movement of the vehicles which is described above.

The Radcliffes, as witnesses in the personal injury case, expressed beliefs that possibly the steering apparatus of their car became locked immediately before the crash. Mr. Hodges swore that Mrs. Radcliffe declared at the scene of the collision that she had "become confused and lost control of her car and came across the highway." Mrs. Radcliffe denied that she made the statement.

Mr. Radcliffe testified that there would not have been any trouble if the Crosley car had not forced his car partly off the pavement, but he added that "we were at fault, too, because we went out of control and we went into this lane and hit them."

In the personal injury cases filed by the Hodgeses, they made as defendants, not only the two Radcliffes, but also one L. K. Milligan, whom they alleged was the operator of the Crosley. It developed at the trial (*Hodges v. Radcliffes*) that the Hodgeses had no evidence which identified Milligan as the operator of the tortious Crosley and he was thereupon released by involuntary nonsuit.

In order to establish liability upon the part of the Radcliffes, Mr. U. S. Balentine, attorney for the Hodgeses, depended in large part upon these facts: (1) the collision occurred in the lane where the Hodges car was properly running, and (2) Mrs. Radcliffe, according to her purported admission, did not possess

control over her car. Mr. Driscoll, in turn, depended upon (1) the rule that a motorist who involuntarily occupies a place upon the left side of the roadway is not negligent per se, (2) a contention that the only fault lay with the operator of the Crosley car, and (3) a charge that the Hodgeses were guilty of contributory negligence as well as failure to have embraced the last clear chance.

As we have seen, the Radcliffes, in the instant case, predicate their claim to judgment in large part upon the manner in which the insurer treated the offer of settlement which the Hodgeses, through their attorney, Mr. Balentine, made to Mr. Driscoll. We now turn to the evidence upon that subject.

Before the Hodgeses secured an attorney they demanded $32,000 damages for the injuries suffered by all four members of the family. The demand was refused. They then retained Mr. Balentine and shortly the two actions were filed. It is desirable to itemize some dates. The accident occurred July 4, 1948. The two actions were filed August 18, 1949. The trial commenced September 21, 1950. September 22 the offer of settlement was made which proposed to accept $10,000 as satisfaction in full of the claims of all four of the Hodgeses. September 26 the verdict was returned.

The following discloses the information which the insurer and Mr. Driscoll possessed when the compromise offer was made by Mr. Balentine to Mr. Driscoll. No representative of the insurer had visited the scene of the collision with either of the Radcliffes. When the insurer employed Mr. Driscoll to defend the Radcliffes, it delivered to him (a) the adjuster's file consisting of signed accounts of the collision given by the two Radcliffes; (b) a letter from an unidentified physician

in California which predicted that Mrs. Hodges would recover completely; and (c) a report from a physician by the name of Dr. B. N. Pease, who practices in Bend and who treated Mrs. Hodges for eight days immediately after her injury. Dr. Pease's report stated that the injury to Mrs. Hodges' left ankle was the most serious result of the accident although it related that "she had a contusion of the chest and other minor injuries." The report disclosed that Dr. Pease performed an operation upon the ankle to secure fixation of the bone fragments by inserting a screw. Mrs. Hodges remained in a Bend hospital under Dr. Pease's care for a week, whereupon she departed for her home in California. Thereafter Dr. Pease did not see her again. The report predicted that the effects of the injury would disappear within four months. It was written July 28, 1948, 24 days after the accident.

The above is a synopsis of the information which Mr. Driscoll possessed when the defense was entrusted to him. The insurer had nothing in addition.

Mr. Balentine's offer to accept $10,000 as satisfaction in full for the damages suffered by the four Hodgeses was made September 22, 1950, the second day of the trial. Thus it was made virtually two years and two months after Dr. Pease made his report. In the meantime, the insurer had not asked that a physician be permitted to examine Mrs. Hodges nor had it requested of Mr. Balentine any information concerning her. Likewise, in the meantime, the insurer had received no information concerning Mrs. Hodges' condition except that afforded by a report from an unidentified physician which predicted a complete recovery and the information yielded by a deposition of Dr. Logan Gray, of San Mateo, California, who attended her after

she left Dr. Pease. We will take note of that deposition later.

In a letter which Mr. Driscoll wrote a month before the trial to Mr. M. W. McClellan, the insurer's chief claim superintendent, he said:

"However, unless the medical testimony shows greater personal injuries than are apparent in plaintiff's deposition, I do not believe the combined judgment will exceed $7,500 or $8,000, and I would be hesitant in recommending even that amount as a settlement."

When that statement was made, Dr. Logan Gray had not yet given his deposition and the only information which Mr. Driscoll possessed was that of which we have taken note. In short, when Mr. Driscoll wrote that letter he had no reason to believe that Mrs. Hodges had suffered a permanent injury. To the contrary, he believed that "her recovery was progressing nicely," as he testified. Likewise, at that time Mr. Driscoll did not know that Mr. Hodges would swear that Mrs. Radcliffe had declared at the scene of the accident that she had "become confused and lost control of her car and came across the highway." Nor did he know that it would be necessary to enter an involuntary nonsuit in favor of Mr. Milligan, the driver of the Crosley.

We have mentioned in part the nature of Mrs. Hodges' injuries. Dr. Gray swore that she came to him July 14, 1948, and that he thereupon began to treat her. According to him, she suffered a Pott's double fracture of her left ankle and the union of the fragments, following the fracture, was fibrous but not osseous. His deposition indicated that her foot has been left in a permanently crippled condition and that she continues to suffer pain from her back injury. Dr. Gray's deposition was taken September 18, 1950, and,

accordingly, Mr. Driscoll could not have seen it until immediately prior to the trial. Dr. Gray's testimony was not contradicted or challenged.

The record describes Mrs. Hodges as an attractive woman, 29 years of age, and it is conceded that she made "a rather pleasing witness."

When Mr. Balentine made his offer to settle all four claims for $10,000, the insurer of Mr. Milligan, through its attorney, Mr. Richard Maxwell, offered to contribute $500 of the needed sum. The offer (Balentine's) was not accepted and it was never withdrawn. The fact that it was made was not disclosed to the Radcliffes and they remained ignorant of it until several weeks after the close of the trial. Mr. Driscoll explained that his failure to have mentioned the offer to the Radcliffes was "purely an oversight."

Mr. Radcliffe swore that he expressed to Mr. Driscoll more than once his concern over the two actions filed by the Hodgeses, and that the attorney replied that he "was sure that we would not win on it but he thought maybe the judgment would be small." When that prediction was made Dr. Gray's deposition had not yet been given. Mr. Radcliffe declared that he told Mr. Driscoll that he was concerned over the fact that (1) his car, at the time of the impact, was in the lane which belonged to the Hodgeses, and (2) judgment was sought in sums exceeding the policy limits. According to him, he "very frequently" told Mr. Driscoll of his desire for a settlement and Mr. Driscoll advised him: "he thought we could make a compromise. He mentioned it a number of times that we might be able to compromise with him (Balentine)." We observe that Mr. Balentine, who died after the trial, had had a large personal injury practice and estimated that

75 per cent of such claims in Klamath county are settled.

Mr. Driscoll believed that there was no liability upon the Radcliffes' part. However, he told Mr. Radcliffe during the trial that "there might be a small verdict in favor of the plaintiffs based purely on sympathy. * * * I told him there was a possibility. Now I may have said 'probability.' " And it will be recalled that a month before the trial Mr. Driscoll predicted in a letter to Mr. McClellan that the verdict might be $7,500 or $8,000 and possibly larger if the medical testimony disclosed "greater personal injuries than are apparent in plaintiff's deposition."

After Mr. Balentine had made the offer to accept $10,000 as satisfaction for all four of the Hodges' claims, Mr. Driscoll consulted over the telephone with Mr. McClellan. At that time Mr. McClellan had not read Dr. Gray's deposition, but he had been told of its trend. The telephone conversation lasted five or ten minutes and in its course Mr. Driscoll expressed the belief that the case was not worth $10,000 and stated that the testimony so far received was of the kind that he had anticipated. At that time the trial was not yet half completed. Both men thought that a verdict for the plaintiff was probable, that it would be based on sympathy and that its purpose would be to defray the plaintiffs' expenses. The two did not think that Mr. Balentine's offer should be accepted but Mr. Driscoll testified:

> "* * * it was my further understanding that I would see Mr. McClellan later in the week and then I figured that it was—if there was any further discussion of settlement it would be up to him. In other words, I had no authority myself."

He meant that he believed Mr. McClellan would come to the trial before its close. Mr. McClellan concluded the conversation with these words: "Well, if they persist in $10,000, let's see it through to a conclusion." When he made that statement he did not know that the $10,000 offer embraced all four claims. He had interpreted the reduction of the settlement offer from $32,000, which was the sum asked by the Hodgeses before they had consulted an attorney, to $10,000 as an indication that Balentine lacked confidence in his cases. As a witness, Mr. McClellan swore that he told Mr. Driscoll on the telephone, "Well, he doesn't think a lot of his case, dropping that fast." Mr. Balentine testified that he reduced his settlement offer to $10,000 when he learned that that sum was the policy limit. He did not think that the Radcliffes were financially responsible. Following the telephone conversation neither Mr. Driscoll nor Mr. McClellan said anything whatever to Mr. Balentine about his offer or a settlement of the Hodges' claims.

At the time of the telephone conversation Mr. McClellan was attending a trial in San Francisco which he deemed more important to his company than the Hodges case. He, however, expected to come to Klamath Falls before the close of the Hodges trial. As it developed, he did not come and his failure to do so was a disappointment to Mr. Driscoll, who swore, "I was disappointed." Mr. Driscoll had no authority to settle the case or negotiate for a settlement. Anticipating that Mr. McClellan would come to the trial, he had not asked for power to settle. He testified, "I would like to have settled." No one at the trial had authority from the insurer to arrange a settlement and the insurer at no time had negotiated for one. When the trial closed and the jury had brought in its verdict,

Mr. Balentine's offer of settlement had received no response.

Mr. Driscoll was surprised "to some extent" by the verdict, so he stated, and added, "I expected a defendants' verdict." Mr. McClellan, who was not present at the trial, thought that the verdict should have been for the defense. Mr. Maxwell did not believe that the Radcliffes were liable and, according to him, "I at no time considered those cases worth $10,000." He thought that Dr. Gray grossly exaggerated Mrs. Hodges' injuries in his deposition, but, as we have said, Dr. Gray's testimony was not contradicted or challenged.

■ We think that the evidence could warrant findings by the jury that (1) the omission to negotiate for a settlement was due to the fact that the insurer had no one at the trial empowered to discuss the subject, and (2) the financial interests of the Radcliffes were not considered when the insurer cast aside the settlement offer.

The above is a sufficient review of the evidence.

■ We have noticed that the policy does not, by express terms, impose upon the insurer a duty to settle claims. However, it requires the insured, if he wishes the insurer to safeguard his interests when a claim is filed against him, to commit the facts and circumstances which may serve his purposes to the insurance company for whatever use it may elect to make of them whether by way of negotiating a settlement or submitting a defense. In the case at bar, the insurance company, upon being apprised of the claims made by the Hodgeses, appointed an investigator who obtained statements from the Radcliffes descriptive of the collision and another from Dr. Pease which gave an account of Mrs. Hodges' injury. Subject to limitations of which we will presently take notice, the insurer is

the sole arbiter of what should be done with the facts gathered in the course of the investigation. If it decides to defend, it selects an attorney and the insured must accept the appointee regardless of personal preferences or dislikes. If an attorney is appointed, that individual maps out the defense and the insured is relegated to the role of cooperating with him. It is, of course, essential to the protection of the insured that the insurer should have sole control of the defense. If the insurer effects a settlement within policy limits, the insured is bound by that disposition of the case whether or not he likes that way of disposing of the matter.

■ Whether, after the defense has been entrusted to it, the insurer is regarded as a trustee or is deemed the agent of the insured, the fact is that it takes custody of the insured's defense. Such is, likewise, true if the insurer is not viewed as a fiduciary but as an independent contractor. Whenever anyone takes custody of something, tangible or intangible, which belongs to another, he owes a duty of care to the latter. We need not pause at this point over the precise nature of the duty. The only material detail is that the custodian owes a duty to the person who entrusted him with the res. The fact that in this case the custodian is an insurance company is immaterial as to existence of the duty to employ care. Custodians must exercise care over the matter entrusted to them, whether or not they are insurers.

■ The extent of the insurer's duty to offers of settlement has been a frequent subject of judicial determination. In resolving cases arising out of such offers, the courts take into account the conflict of interest between insurer and insured which is present when the insured is sued for an amount in excess of the policy's

limit. If the limit is $5,000, the complaint seeks $40,000 damages, and the plaintiff offers to accept $4,000 as satisfaction, the conflict of interests between insurer and insured is apparent. In the conflict each thinks of his own weal. The insured, prompted by a desire to be free from uncertainty, may demand that the insurer settle a claim which is completely unfounded, but in policies such as the one before us, the insurer limits its promise to ''sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages.'' When the insurer rejects a compromise offer of $4,500 under a policy of $5,000 in a case in which $50,000 damages are sought, it thrusts virtually all of the risk upon the insured. In the hope of saving $4,500, the insurer forces the insured to incur a hazard of $45,000. The observation just made is not intended as criticism of insurers. The conflict of interest is bound to continue so long as policies are written for limited protection. Problems of the kind which confront us could be simplified by including in policies a provision stating what should be done in such situations. Such a policy was written and was before the court in *Georgia Life Insurance Co. v. Mississippi Cent. R. Co.*, 116 Miss 114, 76 So 646. There the policy provided for double coverage when a compromise offer was rejected.

In resolving problems such as the one before us, any one of several approaches to the issues may present itself. The solution may be sought in the terms of the policy itself, and the court may attempt to resort to contract law. Or the insurer may be viewed as a fiduciary, possibly as an agent, and thereupon the court will employ the principles of law which govern an agent's relationship to his principal. In such situations the law generally demands good faith. Or the courts

may turn to tort law and hold that the insurer in dealing with the defense, including the matter of settlements, must exercise due care. We will now turn to some of the precedents.

The early case of *Rumford Falls Paper Co. v. Fidelity & Casualty Co.,* 92 Me 574, 43 A 503, rejected a contention that the insurer became liable whenever it declined an offer within the policy limit and the judgment exceeded the limit. Evidently the plaintiff's theory in that case was one of absolute liability, for it submitted no question of negligence or bad faith. Other cases in which matters of good faith and due care received scant mention and in which the decisions approached a holding rejecting any obligation to settle are *McDonald v. Royalty Indemnity Ins. Co.,* 109 NJL 308, 162 A 620; *St. Joseph Transfer & Storage Co. v. Employers' Indemnity Corp.,* 224 Mo App 221, 23 SW2d 215; *Auerbach v. Maryland Casualty Co.,* 236 NY 247, 140 NE 577, 28 ALR 1294. In the latter decision, the court said that the obligation of the insurer was only to do nothing which would be a fraud on the insured. That rule, which, in the light of the great weight of cases from other jurisdictions, is extreme, is the culmination of a line of cases in that state. *Levin v. New England Casualty Co.,* 97 Misc 7, 160 NYS 1041, 101 Misc 402, 166 NYS 1055, aff. 187 App Div 935, 174 NYS 910, 233 NY 631, 135 NE 948; *Silverstein v. Standard Accident Ins. Co.,* 175 App Div 639, 162 NYS 601, 178 App Div 891, 164 NYS 1113, 221 NY 332, 117 NE 307. Pennsylvania apparently has a like extreme rule. *Schmidt & Sons Brewing Co. v. Travelers Ins. Co.,* 244 Pa 286, 90 A 653, 52 LRA(NS) 126. The Schmidt case was free from charges of negligence and bad faith. The court held that the insurer was not required to pay in

advance of trial, and that the policy committed to it the decision whether to settle or not.

At the opposite pole, the proposition that the insurer must settle whenever it has an opportunity to do so within policy limits has been accepted by no court, with the possible exception of Texas. In the case of *G. A. Stowers Furniture Co. v. American Indemnity Co.* (Tex), 15 SW2d 544, 29 NCCA 140, the court relied upon authorities applying the so-called negligence standard of liability to sustain a holding that

"if an ordinarily prudent person, in the exercise of ordinary care, as viewed from the standpoint of the assured, would have settled the case, and failed or refused to do so, then the agent, which in this case is the indemnity company, should respond in damages."

However, the plaintiff had not alleged that anything done by the insurer in deciding to reject the offer of compromise was negligent, but had treated the rejection itself as a negligent act. Thus the court seems to have held that any time the insured would settle, the company must. The later decision of *Linkenhogen v. American Fidelity & Casualty Co.,* 152 Tex 534, 260 SW2d 884, required proof of negligence aside from the decision to reject the offer.

The decisions of which we have so far taken note do not represent the prevalent interpretation of the insurer's duty.

*Noshey v. American Automobile Ins. Co.,* 68 F2d 808 (6th Cir), came before the court as an appeal from an order which sustained a demurrer to the complaint. The limit of the insurer's liability was $10,000. The complaint alleged that (1) the injury inflicted by the insured was serious and permanent; (2) the injured

man had offered to settle for $10,000; (3) the defendant's counsel deemed that liability was clear and recommended that a settlement be made; (4) the insurer's agent conceded the damage suit was desperate and that in all probability the verdict would exceed $10,000; (5) the defendant's agent advised the insureds to transfer their property to their spouses so as to render themselves judgment-proof; and (6) the insurer's agent had misrepresented what the insurance company would do. The complaint of the injured man sought damages in the sum of $40,000. Judgment was recovered for $22,500. In reversing, the Court of Appeals said:

"It appears to be well settled in cases of limited liability insurance that the insurer may so conduct itself as to be liable for the entire judgment recovered against the insured although the judgment exceeds the amount of liability named in the policy. Some of the cases hold that the insured is entitled to recover upon proof that the insurer in refusing to settle a claim for damages was guilty of negligence. In so far as any standard of due care may be applied to the exercise of an honest judgment in accepting or refusing an offer of compromise, the test is rejected in the better reasoned cases, and we think rightly so. The practical difficulties in applying such standard are at once suggested by the rhetorical question in the Best Building Company Case, supra, 'We may ask what would constitute negligence in the failure to settle a case, as distinguished from bad faith,' and by the laconic observation of the Kentucky Court in Georgia Casualty Company v. Mann, 242 Ky. 447, 46 S.W.(2d) 777, 779, 'The gift of prophecy has never been bestowed on ordinary mortals.' Nor within the policy limits has the insurer any contract obligation to effect settlement, as the policy contains no promise that it will do so under any and all conditions or circumstances, and none is to be implied, and beyond the policy

limits the insurer has of course no authority to bind the assured by compromise in any amount whatsoever. The prevailing rule seems to be, however, that the insurer must act in good faith toward the assured in its effort to negotiate a settlement. This the defendant concedes, * * *

"We think the declaration thus reviewed sufficiently alleges facts which, if proved, would reasonably sustain a verdict for the full amount of the judgment in excess of the policy coverage, based upon the bad faith of the defendant in its negotiations for settlement, and in its failure to settle while it had opportunity before suit. It is no answer to the charge of bad faith to say that the law authorizes the plaintiffs to settle their liability beyond the amount of the coverage notwithstanding the policy provision forbidding it, or to say that the defendant having orally authorized plaintiffs to settle the damage case the provision of the policy was waived, and the plaintiffs not having attempted settlement in pursuance of such waiver cannot now complaint of the defendant's failure to give written authority for settlement. The plaintiffs were under no obligation to imperil their protection under the policy by a breach of its express provisions, nor even to invite a denial of liability and be put to delay and expense of suit to enforce it. Moreover, if forced to sue on the policy they would still be under the obligation to satisfy a jury that under the circumstances as they appeared at the time of undertaking settlement there was reasonable probability of a recovery against them in the damage suit of a judgment in excess of the policy liability. * * *"

It will be observed that the court dismissed the due care theory as the test of the insured's liability, but held that when an insurer, in bad faith, rejects an offer of settlement it renders itself liable to the insured.

Some courts employ the negligence or due care

theory in determining whether or not the insurer rendered itself liable to the insured when it dealt with a settlement matter. The test could properly be termed the New Hampshire or Texas rule, for in those jurisdictions it has undergone its greatest development. In a case in which the insurer made no serious attempt to settle and liability was reasonably clear, the New Hampshire court spoke of settlement as "the reasonable thing to do." It said: "As to that there can be no question; for, when the defendant assumed control of the Blais claim, it then and there became its duty to do what the average man would do in a similar situation." *Cavanaugh v. General Accident F. L. Assur. Corp.*, 79 NH 186, 106 A 604. Five years later the same court reaffirmed the rule which stood against the larger body of doctrine in the field. The instance was *Douglas v. United States F. & G. Co.*, 81 NH 371, 127 A 708, in which the policy limit was $5,000, the offer of settlement was $1,500, and the verdict was $13,500. The insurer sought to sustain its rejection of the offer by claiming that the injured man's mental condition was such that a binding settlement could not have been made and that it (the insurer) had no reason to believe that the defendant in the personal injury action was liable. In holding the insurer liable, the decision held that the evidence as to mental condition was conflicting and that circumstances pertaining to liability which were known to the employer were unknown to the claims agent and the attorney for the insurer when the settlement offer was rejected. In sustaining the insurer's liability, the court said: "The case is governed by *Cavanaugh v. Corporation*, 79 NH 186, 106 A 604." It then re-examined the test of due care and in so doing took note of the fact that many courts act upon the principle that the insurer has an

exclusive option to settle or not as it chooses. Pertaining to that, it held:

"* * * Exclusive authority to act does not necessarily mean the right to act arbitrarily. Our law upon the subject is based upon the broad proposition that in all its dealings with the defense to Elliott's claim the defendant was bound to act as a reasonable man might act under the same circumstances.

* * * * *

"The fundamental question is, Does or does not the insurer owe to the insured a duty in the matter of a settlement? If it does not owe such a duty, it is not liable either for a failure to act or for the manner of action. It may refrain from completing a settlement for any reason, however essentially dishonest, and still there would be no liability. If, as the cases roundly state, it has an exclusive and absolute option, no one can question its motives for the exercise or nonexercise of the privilege. No case has gone that far. All acknowledge a liability for fraudulent conduct, or lack of good faith, in refusing to settle. But they are silent as to any reasoning which would sustain such liability and at the same time deny responsibility for negligent conduct.

"The whole question of insurance against loss may be laid out of the case, and still the defendant would be accountable for negligence. It had contracted to take charge of the defense of this claim. That contract created a relation out of which grew the duty to use care when action was taken."

*Dumas v. Hartford Accident & Indemnity Co.*, 94 NH 484, 56 A2d 57, states:

"The duty of the insurer was not only to pay on behalf of the insured all sums the latter should become obligated to pay because of bodily injury within the policy limit of $5,000, but also to save the insured harmless from any and all liability

caused by accident and arising out of the owner-
ship, maintenance or use of his automobile in so
far as it could do so by a reasonable performance of
its service to settle claims. It is a well-recognized
rule in the law of negligence that, when one knows
or has reason to anticipate that the person, prop-
erty, or rights of another are so situated as to him
that they may be injured through his conduct, it
becomes his duty so to govern his action as not neg-
ligently to injure the person, property, or rights of
that other. Attleboro Mfg. Company v. Frankfort
Marine, Accident & Plate Glass Ins. Company, 1 Cir.,
240 F. 573, 579. 'The whole question of insurance
against loss may be laid out of the case, and still
the defendant would be accouuntable for negligence.
It had contracted to take charge of the defense of
this claim. That contract created a relation out
of which grew the duty to use due care when action
was taken. The insurer entered upon the conduct
of the affair in question. It had and exercised au-
thority over the matter in every respect, even to
negotiating for a settlement. It is difficult to see
upon what ground it could escape responsibility
when its negligence resulted in damage to the party
it had contracted to serve.' Douglas v. United States
Fidelity & Guaranty Company, supra, 81 N. H. page
376, 127 A page 711, 37 A.L.R. 1477.''

The foregoing New Hampshire decisions are good rep-
resentatives of those which employ the negligence
theory. A preceding paragraph takes notice of two
Texas decisions.

*Abrams v. Factory Mutual Liability Insurance Co.,*
298 Mass 141, 10 NE2d 82, in construing a policy not
dissimilar to the one before us, said:

"The first count is in contract.
\* \* \* \* \*

"The second count is in tort for negligence.
\* \* \* \* \*

"We think that each count did contain a statement of a cause of action. By the express terms of the policy the defendant obligated itself to defend lawsuits. If it did not settle, it was bound to defend. Connoly v. Bolster, 187 Mass. 266, 270, 72 N. E. 981; Miller v. United States Fidelity & Casualty Co. (Mass.) 197 N.E. 75. When a party binds himself by contract to do a work or to perform a service, he agrees by implication to do a workmanlike job and to use reasonable and appropriate care and skill in doing it. This is true whether the work consists in building a house, repairing an automobile, treating a patient or defending against a claim or a lawsuit. The plaintiff could maintain an action of contract against the defendant if, without excuse, the defendant wholly refused to defend. He can likewise maintain an action of contract if the defendant defended negligently.

\* \* \* \* \*

"The count in tort states a cause of action as well as the count in contract. Although the duty arises out of the contract and is measured by its terms, negligence in the manner of performing that duty as distinguished from mere failure to perform it, causing damage, is a tort.

\* \* \* \* \*

"As each count also charges negligence in refusing to make a settlement within the policy limit, and as the case has been fully argued, it is proper to add that in our opinion liability under this policy for such negligence is negatived by the terms of the policy itself. There is no promise to settle or to attempt to settle comparable to the promise to defend where there is no settlement. Defense is a part of the protection of the policy. Settlement is optional with the insurer. Although the insured may be prejudiced by the insurer's refusal to accept an advantageous offer, yet we think that the policy entrusts the matter of settlement to the judgment of the insurer, and that its judgment, exer-

cised in good faith, is final. * * * We need not decide that there can never be actionable negligence of any kind in connection with the handling of settlements, but something more must be shown than failing to make a settlement which a reasonably prudent person exercising due care 'from the standpoint of the assured' would have made."

There the court made a distinction in the liability which an insurer sustains when it is charged with having negligently (1) defended a case, and (2) rejected an offer of settlement. It held that an action against the insurer, based upon an improperly conducted defense, may employ either the contract or the negligence theory. Then it declared that since "there is no promise to settle" and the matter of settlement "is optional with the insurer," settlement offers are entrusted "to the judgment of the insurer." It concluded that in settlement matters the insurer's "judgment exercised in good faith, is final." Although the decision has an atmosphere which indicates that the insurer is not liable for its conduct in settlement matters, yet the holding that rejection of settlement offers made "in good faith, is final" seems to warrant a belief that if the rejection was not made in good faith a liability arises. Surely no insurer can act arbitrarily or corruptly with a settlement offer merely because settlement is committed "to the judgment of the insurer." The court, it will be recalled, pointed out that in such instances "something more must be shown" than the failure of the insurer "to make a settlement which a reasonably prudent person exercising due care 'from the standpoint of the assured' would have made."

It will be observed that in the decision just reviewed the court held that actions based upon a negligently

conducted defense may employ both the contract and the negligence theory. *Tiger River Pine Co., v. Maryland Casualty Co.,* 163 SC 229, 161 SE 491, is an instance in which a court held that both the negligence and bad faith theories may be employed in charging an insurer with liability for its handling of a settlement matter. The decision was rendered upon a demurrer to a complaint which charged wanton disregard of the insured's rights, hostile attitude and "reckless, contumacious and fraudulent" conduct whereby settlement offers of $100 and $175 under a policy of $5,000 were ignored. The complaint also charged that after the offers were ignored the trial resulted in a verdict for $7,000 which was later succeeded by an offer from the plaintiff to accept $5,000 but that the insurer "acting in bad faith and derogation of plaintiff's interests refused to settle." After the Supreme Court of South Carolina had sustained the ruling of the trial court which overruled the demurrer, the insured recovered judgment for the excess and the insurer again appealed. In sustaining the challenged judgment, the court found that there was evidence sufficient to go to the jury on both the issues of negligence and bad faith. *Tyger River Pine Co. v. Maryland Casualty Co.,* 170 SC 286, 170 SE 346.

*Hilker v. Western Automobile Ins. Co.,* 204 Wis 1, 231 NW 257, 204 Wis 12, 235 NW 413, in which the policy provided that the insured "shall not interfere in any negotiations for settlement or any legal procedure," reasoned the situation in this way:

> "In express terms the contract imposes no duty at all a breach of which makes the insurer liable to the insured for a failure to settle or compromise a claim. However, all courts are agreed that the insurer does owe to the insured some duty in this

respect. This duty is implied as a correlative duty growing out of certain rights and privileges which the contract confers upon the insurer. By the terms of this contract the absolute control of the defense of such actions is turned over to the insurer, and the insured is excluded from any interference in any negotiations for settlement or legal procedure. * * * However, where an injury occurs for which a recovery may be had in a sum exceeding the amount of the insurance, the interest of the insured becomes one of concern to him. At this point a duty on the part of the insurer to the insured arises. It arises because the insured has bartered to the insurance company all of the rights possessed by him to enable him to discover the extent of the injury and to protect himself as best he can from the consequences of the injury. He has contracted with the insurer that it shall have the exclusive right to settle or compromise the claim, to conduct the defense, and that he will not interfere except at his own cost and expense. * * *

"It is the right of the insurer to exercise its own judgment upon the question of whether the claim should be settled or contested. But because it has taken over this duty, and because the contract prohibits the insured from settling, or negotiating for a settlement, or interfering in any manner except upon the request of the insurer, such as assisting in the securing of witnesses, etc., its exercise of this right should be accompanied by considerations of good faith. Its decision not to settle should be an honest decision. It should be the result of the weighing of probabilities in a fair and honest way. If upon such consideration it decides that its interest will be better promoted by contesting than by settling the claim, the insured must abide by whatever consequences flow from that decision. He has so agreed. But, as already stated, such decision should be an honest and intelligent one. It must be honest and intelligent if it be a good-faith conclusion. In order that it be honest

and intelligent it must be based upon a knowledge of the facts and circumstances upon which liability is predicated, and upon a knowledge of the nature and extent of the injuries so far as they reasonably can be ascertained.

"This requires the insurance company to make a diligent effort to ascertain the facts upon which only an intelligent and good-faith judgment may be predicated.   *   *   *

"In addition to this a further duty plainly devolves on the insurer. After it has made an investigation of the accident and the injury, and faces the probability that a recovery will exceed the indemnity, it plainly becomes the duty of the insurer to indicate such fact to the insured, to the end that he may take such steps as may be open to him for his own protection."

That judicial pronouncement is another representative of those which subject the insurer's conduct in the handling of settlements to the test of good faith. But the court in that case expressly demanded that a decision which rejects a settlement offer must be "an honest decision" and held that no rejection of a claim can be deemed an honest decision unless the insurer preceded rejection with "a diligent effort to ascertain all facts" governing liability and showing the nature and extent of the injury. Thus the insurer must employ due care in apprising itself of the facts and to that extent the two tests of due care and good faith went hand in hand in the determination of that case.

We shall review no further the decisions which determine the theory upon which the insurer becomes liable for a wrongful rejection of an offer of settlement. All of the decisions are classified in 40 ALR2d 168, and the excellent treatment given them there renders unnecessary any grouping by us. The compiler of the annotation states:

"* * * the vast majority of the courts have held, and it is probably the accepted rule in all jurisdictions at this time, that the insurer is bound to give some consideration to the insured's interest in such a situation, * * *."

Some jurisdictions such as our own have made no pronouncement upon the subject. Of those that have spoken, we agree that "it is probably the accepted rule * * * that the insurer is bound to give some consideration to the insured's interest." The annotator continues his analysis of the cases with this statement:

"* * * the pronounced split in the decisions involves the question whether the insurer's obligation is only to act in 'good faith' to the insured in considering such an offer, or whether it is required to exercise 'due care' and is liable for a negligent rejection of the compromise."

The report is then made that "the great majority" of the cases employ the good faith rule.

■ Universal recognition that the insurer owes a duty in regard to the settlement of claims and actions has not yielded a rule which clearly defines the duty. The problem has been the subject of many law review articles: Appleman, Duty of Liability Insurer to Compromise Litigation, 26 Ky L J 100; Bachman, Settle— or Else !, 19 Insurance Counsel J 142; Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv L Rev 1136, and the aforementioned annotation in 40 ALR2d 170. We have noticed the discord among the decisions which hinges upon the question as to whether the insurer's liability is determined by the criterion of good faith or by that of due care. The development of those tests did not produce a rule which specifies the insurer's duty. Lacking a definite rule, the cases display a tendency to determine liability upon a case to

case basis. The rules of good faith and due care, which in the beginning were alien to each other, are undergoing transition. Appleman, Insurance Law and Practice, §§ 4712 and 4713, states that the trend is away from the good faith rule toward the negligence rule, but the annotation in ALR (40 ALR 168) which was written after Appleman had produced his volume, says:

"\* \* \* And in a large number of the more recent cases the two tests of 'good faith' and 'negligence' have tended to coalesce, with many of the courts which have in terms rejected the 'negligence' test, arguing, nontheless, that the insurer's negligence is a relevant consideration in determining whether or not it exercised the requisite good faith."

A treatise, Liability Insurance and Responsibility for Settlement, which appears in 67 Harv L Rev 1136, states:

"The distinction between the 'bad faith rule' and the 'negligence rule' is less marked than these terms would suggest. \* \* \* Even the jurisdictions following the 'bad faith rule' concerning settlement recognize, at least by implication, that company must, if it fails to settle, defend with ordinary care; the negligence in investigation which leads to a mistake in failing to settle is also a breach of this duty of ordinary care in defense. \* \* \*

"A second factor minimizing the importance of the distinction between the 'bad faith rule' and the 'negligence rule' is the adoption by some courts of a dual standard requiring only good faith as to the *decision* regarding settlement but requiring also ordinary care in the investigation leading to such decision."

In Comments, 48 Mich L Rev 95, a writer, referring to the two rules, says:

"In spite of the differences in the reasons given by various courts, the rules adopted and the lan-

guage used, it seems that the results reached are much the same.''

The annotation in 40 ALR 168 takes notice of the fact that

"When it comes to a question of what particular acts, conduct or circumstances are sufficient to charge the insurer with liability to the insured, it appears that much the same factors have been relied upon in those cases finding a breach of good faith as in those finding negligence."

*Hilker v. Western Automobile Ins. Co.,* supra, which, in permitting the employment of the dual standard, stated: ''Negligence has been used by some courts to mean the same thing that other courts have designated as bad faith.'' It then referred to efforts to maintain a distinction between due care and good faith as leading to ''tautological confusion.'' We are satisfied that the two rules are on their way to an amalgam and that the real question which confronts courts in cases such as the one at bar cannot be solved merely by redefining either good faith or due care. Rather, according to our belief, the problem may be clarified by concentrating the attention upon the inquiry: how much protection is promised to the insured by policies such as this one.

As we have indicated, the issue which we must decide is how much protection was promised to the Radcliffes by the insurance company when the policy at bar was issued. We agree with the authorities of which we have taken notice that policies of this kind grant the insurer jurisdiction over settlements and require of them a duty in regard thereto. The trend of the judicial pronouncements is distinctly away from such decisions as *St. Joseph Transfer & Storage Co. v. Employers' Indemnity Company,* supra, which cut down the duty almost to the vanishing point. In the case just

cited, the Missouri court ruled that the insurer need do little more than refrain from action prejudicial to the insured which was not beneficial to itself. In the later case of *Zumwalt v. Utilities Insurance Co.*, 360 Mo 362, 228 SW2d 750, the court held that no liability exists "unless the insurer is guilty of fraud or bad faith in refusing to settle a claim within the limits of the policy." In that case, judgment for the plaintiff was affirmed, the court holding that bad faith appeared when the insurer refused an offer of $4,500 under a $40,000 claim which resulted in a $15,000 judgment. The policy limit was $10,000, $5,000 of which was re-insured. The insurer refused to settle because the re-insurer would contribute nothing. The court held that bad faith was established by those circumstances. The instance just reviewed is only one of several which could be cited in which a more recent decision exacted more of an insurer than an earlier holding.

██ The minimum which is expected of an insurer is that it employ good faith when it disposes of settlement matters. We shall now take note of a few decisions which reveal the tenor of good faith. Many of the decisions, of which *City of Wakefield v. Globe Indemnity Co.* is an illustration, declare that "good or bad faith is a state of mind." *Olympia Fields Country Club v. Bankers Indemnity Insurance Co.*, 325 Ill App 649, 60 NE2d 896, illustrates that statement. Most definitions of bad faith, which speak of it as a "state of mind," add that it need not be established by direct evidence.

██ Many decisions have dealt with the issue of faith in a practical manner. Courts frequently hold that a refusal by the insurer to settle unless the insured contributes a part of the needed money is evidence of bad faith. In *Brown & McCabe v. London Guarantee*

& *Accident Co.*, 232 F 298, Judge ROBERT BEAN, formerly of this court, employed the term "holdup" in speaking of efforts of the insurer to induce the insured to contribute to settlement offers. The annotation in 40 ALR 168 at 205 declares that such demands are generally regarded "as strong evidence of bad faith," yet in *Mendota Electric Co. v. New York Indemnity Co.*, 169 Minn 377, 211 NW 317, 175 Minn 181, 221 NW 61, a demand that the insured contribute to the settlement money escaped condemnation. *Johnson v. Hardware Mutual Casualty Co.*, 108 Vt 269, 187 A 788, in the following much-quoted language, delineates some of the elements of bad faith:

> "* * * an intentional tort of an active and affirmative nature. It is not a technical term used only in actions of deceit. It is an ordinary expression, the meaning of which is not doubtful. It means with actual intent to mislead or deceive another. It refers to a state of mind capable of both direct and circumstantial proof."

In *Hall v. Preferred Accident Insurance Co.*, 204 F2d 844, 40 ALR2d 162, the court, referring to good faith, gave this standard:

> "A defense going far enough to show reasonable and probable cause for making it will vindicate the good faith of the insurance company."

In *Kleinschmit v. Farmers Mutual Hail Insurance Assn.*, 101 F2d 987, the court said:

> "* * * it cannot be said to be bad faith to deny a claim when there is substantial evidence to support the denial."

The two rulings just quoted afford the insured protection from arbitrary or capricious conduct on the part of the insurer. In *Royal Transit v. Central Surety Insurance Corporation*, 168 F2d 345, the damages

sought were $100,000; the policy limit was $45,000; the offer of settlement was $40,000 of which the insured agreed to pay $5,000; the verdict was $62,500. The decision, referring to the insurer's claim agent and affirming judgment in favor of the insured for the excess, said:

> "In our judgment, the record discloses that his refusal to discharge this obligation was arbitrary, capricious and without any rational basis, and certainly the finding of bad faith is amply supported. As the court stated in Traders & General Ins. Co. v. Rudco Oil & Gas Co., 10 Cir., 129 F2d 621, 627, 142 A.L.R. 799, with reference to a similar situation:

> " 'Exclusive authority to act does not necessarily mean the right to act arbitrarily. * * * The right to control the litigation in all of its aspects carries with it the correlative duty to exercise diligence, intelligence, good faith, honest and conscientious fidelity to the common interest of the parties.' "

We deem especially pertinent the last few words of the quotation, "honest and conscientious fidelity to the common interest of the parties." We approve all of the above definitions. As we have said, the minimum requirement is that the insurer must exercise good faith in disposing of settlement matters. We do not believe that an insurer displays good faith unless it gives consideration to the interests of the insured.

Good faith may frequently be determined by ascertaining whose interest was deemed paramount, the insured's or the insurer's when the insurance company rejected an offer of settlement; in other words, whose interest was sacrificed at that time. We have taken note of the fact that a conflict of interests between the insured and the insurer presents itself when damages are sought in excess of the policy limit and an offer

of settlement which approximates the policy limit is received. It is essential to know whose interest must be safeguarded when action is taken upon the offer.

In *Wisconsin Zinc Co. v. Fidelity & Deposit Co.,* 162 Wis 39, 155 NW 1081, Ann Cas 1918C 399, the policy limit was $5,000, the complaint sought $20,000 damages and the injured man offered to settle for $4,000. The offer was rejected and judgment was recovered for $12,500. In holding that the insured could not recover except upon a count for fraud, the decision, referring to the insurer, said:

> "It either had the right to consider its own interests as being paramount or it had not. Under the language of the policy, we think it had such right."

Again it said:

> "The power of settlement given the insurer cannot be used for the purposes of fraud or oppression, and the courts, in so far as they have passed upon the question, hold that the power conferred must not be exercised in bad faith. * * * While the defendant (insurer) had the right to consult what it deemed to be its own interest in making a settlement, it could not abuse the power vested in it and recklessly and contumaciously refuse to settle if it was apparent that in all reasonable probability its conduct would not only result in damage to the plaintiff, but also in loss to itself."

The extreme language whereby the insurer's interests were deemed paramount was overruled in *Hilker v. Western Automobile Insurance Co.,* supra. *St. Joseph Transfer & Storage Co. v. Employers' Indemnity Corportion,* supra, embraced a view quite similar to that of the Wisconsin Zinc Company case, supra. In *American Mutual Liability Insurance Co. v. Cooper,* 61 F2d 446, cert. denied 289 US 736, 77 L ed 1483, 53 S Ct 595, it appeared that the insurer (1) had made no

effort to determine the extent of the injuries; (2) ignored the advice of its counsel; (3) failed to have a representative at the trial authorized to make settlements; and (4) rejected an offer to settle for $3,000 when the policy fixed a limit of $5,000. One of the reasons why it rejected the $3,000 offer was because the insured refused to contribute. Judgment for the injured party in the amount of $13,500 was entered. The decision sustaining the insurer's liability was rested upon a test of good faith. The court, speaking of decisions which employ the good faith test, said:

"* * * There are cases of the latter class which exonerate the insurer if, considering its own interest only and ignoring entirely the interest of the insured, it acts in good faith; but the prevailing rule seems to be that the insurer must act in good faith toward the insured."

Presently it concluded in this way:

"* * * In our opinion, the insurer cannot escape liability by acting upon what it considers to be for its own interest alone, but it must also appear that it acted in good faith and dealt fairly with the insured."

*Farm Bureau Mutual Automobile Ins. Co. v. Violano,* 123 F2d 692, cert. denied 316 US 672, 86 L ed 1747, 62 S Ct 1043, held that an insurer which acts in good faith and considers the interests of the insured as well as its own cannot be required to settle rather than litigate a doubtful issue. The insurer is not required in such a situation to bear the excess if the defense fails and the verdict exceeds the policy limit. *American Fidelity & Casualty Co. v. G. A. Nicholson Co.,* 173 F2d 830, and *American Fidelity & Casualty Co. v. All American Bus Lines, Inc.,* 190 F2d 234, cert. denied 342 US 851, 96 L ed 642, 72 S. Ct 79, each held

that although the insurer may give consideration to its own interests in considering a settlement offer, it must give at least equal consideration to those of the insured. *Southern Fire & Casualty Co. v. Norris,* 35 Tenn App 657, 250 SW2d 785, pointed out:

> "* * * The insurer is under no duty to compromise a claim for the sole benefit of its insured if to continue the fight offers a fair and reasonable prospect of escaping liability under its policy or of getting off for less than the policy limit. The insured surrenders to the insurer the right to investigate and compromise or contest claims knowing that, in event of a claim, the insurer will have its own interests to consider. But an insured also has a right to assume that his interests will not be abandoned merely because the insurer faces the prospect of a full loss under the policy. The relation is one of trust calling for reciprocity of action. The insured owes the duty of full co-operation— the insurer the duty of exercising good faith and diligence in protecting the interest of its insured."

In *Home Indemnity Co. v. Williamson,* 183 F2d 572, the insured, whose name was Coop, had loaned his car to another who had an accident which injured two persons. Since the circumstances of the accident persuaded Coop that he was not responsible for the consequences, he did not notify the company immediately. A clause of the policy permitted the company to refuse to defend the insured if the accident was not reported promptly. Sometime after the accident suits were filed by the two injured persons and the insured thereupon called upon the company to defend, which it did. Secret compromise negotiations brought offers of $4,500 for the two claims. The offers were rejected. Judgments totaling $17,500 were had and the insurer then brought suit against the insured for a declaratory judgment

under a nonwaiver provision of the policy. The court said: "This was evidence tending to show that the insurer was looking solely after its own interest and wholly disregarding the interest of the insured." It added that the company "lulled Coop into fancied security in order to continue in charge of the case, at the same time trying to screen itself from ultimate liability." Regardless of the definition which one gives to the term "bad faith", he should have no trouble in identifying conduct of that kind as bad faith.

When *Johnson v. Hardware Mutual Casualty Co.* (109 Vt 481, 1 A2d 871) came before the court again, the court, seemingly, retreated from some of the immoderate language of its first opinion. It said:

> "When the company accepted the premium charged for the policy, it impliedly undertook to use this control and management for the mutual benefit of the parties to the contract. * * * It had a right to look after its own interests, but it was bound to have due regard for the plaintiff's interests, as well. If in what it did and refused to do, it acted honestly and according to its best judgment, this suit must fail. If, on the contrary, it used its authority * * * to save itself from as much of the loss as possible, in disregard of the plaintiff's rights, consciously risking loss to the plaintiff to save loss to itself, the suit must succeed; for that would be bad faith, * * *. As applied to this case, bad faith on the part of the defendant would be the intentional disregard of the financial interests of the plaintiff * * *."

We take the following from *Tyger River Pine Co. v. Maryland Casualty Co.*, supra:

> "Defendant further contends that there is no proof of the allegation that defendant acted in bad

faith in its conduct of the negotiations for settlement * * *. This, too, was a question for the jury to decide. * * * The defendant places its reliance for support of its contention on the opinion of the Court of Appeals of Kentucky in the case of Georgia Casualty Company v. Mann, reported in 242 Ky.447, 46 S.W.(2d) 777, 779. We do not agree with the conclusion reached by the Kentucky court in that case. The argument and logic of the line of cases of which the Attleboro Case, supra, is typical, is far more convincing, and is more in consonance with the contract of indemnity here under consideration. The Kentucky court says: 'At the outset it must not be overlooked that the insurance company is something more than the mere agent of the insured. Under the contract it occupies a twofold relation, one as insurer and the other as agent of the insured, *and may look to its own interests as well as those of the insured,* and what would be considered a compromise from the standpoint of the insured might not be a compromise from the standpoint of the insurance company.' (Italics added.)

"We especially dissent from the language of the opinion which we have italicized. The very thing which the appellant in the case which we have before us for determination undertook to do was to hold the respondent harmless in the disposition of Chesser's claim. If, in the effort to do this, its own interests conflicted with those of respondent, it was bound, under its contract of indemnity, and in good faith, *to sacrifice its interests in favor of those of the respondent.* If the Kentucky rule is the law, then a policy of indemnity such as is before us becomes a delusion and a snare. In the nature of things when there is a conflict of interests— as is inevitably the case in all such matters—the company will give the preference to its own."

The above holding was quoted in *Olympia Fields Country Club v. Bankers Indemnity Insurance Co.,* supra.

In *Dumas v. Hartford Accident & Indemnity Co.*, 94 NH 484, 56 A2d 57, the court said:

"* * * In other words, in deciding whether or not to settle the insurer must be as quick to compromise and dispose of the claim as if it itself were liable for any excess verdict. Douglas v. United States Fidelity & Guaranty Company, supra, 81 N. H. page 376, 127 A. 708, 37 A.L.R. 1477. Moreover, it follows from the standard of due care that the insurer cannot be too venturesome and speculate with a trial of the issues in the accident case at the risk of the insured."

The above completes our review of the authorities.

In most commercial transactions the party who wishes another to render a service parts with nothing except the sum which represents the consideration, but when an automobile owner obtains liability insurance he not only delivers the premium money to the company but relinquishes rights which may be of grave consequence to him; that is, he surrenders his right to act in his own behalf in the event an accident happens. The surrender just mentioned occurs in a two-fold manner: (1) he renounces his right to select and control the counsel who will defend him, and (2) he relinquishes his right to negotiate a settlement. In the instant case, the insurer argues that the insured, in return for the relinquishments just mentioned, received nothing but a promise to be (1) saved harmless to the extent mentioned in the policy, (2) treated honestly, and (3) dealt with fairly. The construction of the policy which the insurer wishes us to embrace would afford the insured virtually no protection apart from the insurer's duty to make payment except to place a curb upon the insurer, preventing it from abusing the powers granted to it by the insured.

■ We think that an automobile owner who secures a policy of liability insurance believes that his protection goes beyond the rights suggested by the insurer. Keeton, in his aforementioned treatise (67 Harv L Rev 1136) suggests that the controlling rule should balance the risks involved and thereby cause the insurer in settlement matters to behave as if it were liable for the entire judgment that may eventually be entered. There is manifest merit in the suggestion. Keeton's recommendation has found acceptance in decisions such as *Dumas v. Hartford Accident & Indemnity Co.*, supra, which require the insurer to be as "quick to compromise and dispose of the claim as if it itself were liable for any excess verdict."

■ Plainly, an automobile owner who procures a policy of limited liability insurance understands that the company is in business and that unless it looks after its own interests it cannot expect to survive. The insurer, obviously, has a right to give heed to its own interests when it considers settlement offers, but when it does so it must give at least as much attention to those of the insured. The latter were entrusted to it for protection. When an accident occurs, followed by a claim asserted by the injured person, the common interests of the insured and the insurer are in jeopardy. Although the company, in dealing with the situation, has a right to consider its own interests, it has no right to sacrifice those of the insured. The decision made in such a situation must be an honest one, it must be made in good faith and with due consideration for the interests of the insured.

In the instant case, as we have seen, the insurer received on the second day of the trial a settlement offer of $10,000. Previously, when the only information it had indicated that a complete recovery would occur

within four months and that the evidence would show that the Radcliffes' car entered into the Hodges' lane without fault, the company's attorney estimated that a verdict for the plaintiff might approximate $7,500 or $8,000. Therefore, when the $10,000 offer was received, the company could reject it without being accused of bad faith, if the above information concerning liability and injury was all that an investigation, conducted with due diligence, would have brought to light. But it developed that Dr. Gray, who had attended Mrs. Hodges since she left Oregon, would swear that her injuries were permanent. When that fact came to light the insurer had no information to the contrary and was not in a position to contradict Dr. Gray or lessen the force of his testimony. Moreover, it developed that the Hodgeses had evidence which showed that the Radcliffe car entered into the left lane through the fault of Mrs. Radcliffe.

We know of no reason for believing that the evidence just mentioned concerning liability and injury could not have been discovered by the insurer through the exercise of reasonable diligence.

The mere rejection of a settlement offer does not suffice to save the insurer harmless, nor is it sufficient to show that the insurer, in rejecting a settlement offer, had no evil purposes. Negative elements do not meet the demands of good faith. A decision by one who is ignorant of the controlling facts is worthless. Only a decision made by one who exercised due diligence in apprising himself of the material facts is entitled to respect as made in good faith.

Again, we believe that an insurer, upon receiving a settlement offer in a case such as this in which an excess verdict is sought, owes a duty to inform the insured so that the latter may take whatever course

may be necessary for the protection of his own interests in the event the insurer rejects the offer.

In the instant case, Mr. McClellan, who was the only person who had authority to settle, never possessed sufficient information concerning liability and injury to enable him to render a decision concerning the offer which could be deemed the product of good faith.

As we have indicated in a preceding paragraph, the evidence is susceptible to an interpretation that when the settlement offer was dismissed the financial interests of the Radcliffes were given no consideration.

It is our belief that the circuit court erred when it directed the jury to return a verdict for the defendant, United National Indemnity Company. We think that the evidence presented issues for the jury's determination. The foregoing paragraphs are not intended to adjudicate that if the case had been submitted to the jury and if the latter had returned a verdict for the plaintiffs, it could not be said by the court, as a matter of law, that the verdict lacked support in the evidence.

The judgment of the circuit court is reversed and the cause is remanded for a new trial.