Argued May 7, reversed September 25, 1975

EASTHAM, *Respondent, v.* OREGON
AUTOMOBILE INSURANCE COMPANY,
*Appellant.*

540 P2d 364

*William H. Morrison,* Portland, argued the cause for appellant. With him on the briefs were Thomas Healy Tongue, and Morrison, Dunn, Cohen, Miller & Carney, Portland.

*Douglas E. Kaufman,* Tillamook, argued the cause for respondent. On the brief were C. S. Emmons, of Emmons, Kyle, Kropp & Kryger, Albany, and McMinimee and Kaufman, Tillamook.

Before O'CONNELL, Chief Justice, and McALLISTER,* DENECKE,* HOLMAN, HOWELL, and BRYSON, Justices.

HOLMAN, J.

Plaintiff brought an action against one, Byrd, for personal injuries resulting from an automobile accident and secured a judgment against Byrd in the sum of $50,000. Byrd had liability coverage in the maximum sum of $25,000 which was furnished by the defendant, Oregon Automobile Insurance Company (the company). The company expended the policy maxi-

---

* McAllister, J., and Denecke, J., did not participate in the decision of this case.

mum in partial satisfaction of the judgment. Byrd assigned to plaintiff any claim that he might have against the company for bad faith in failing to settle or failing to attempt to settle plaintiff's claim against Byrd within Byrd's policy limits. The present action is one by plaintiff on Byrd's assigned claim. Trial was had by jury and a judgment was entered upon a verdict for plaintiff. The company appeals.

The principal assignment of error concerns whether there was sufficient evidence to make a jury question on the issue of bad faith and, thus, whether the trial court erred in denying the company's motion for a directed verdict. The discussion of such a question necessitates an extensive statement of the facts surrounding the accident and plaintiff's injuries as were known or reasonably should have been known by the parties to the first case before, at, and during the time of trial.

At the time of the accident plaintiff was 20 years of age and a strong, vigorous, and enthusiastic young man. The automobile he was operating was struck from the rear by a vehicle operated by Byrd. The blow was of sufficient force to break loose the seat in which plaintiff was sitting. Byrd had been drinking, but he did not appear to be drunk at the time of the accident and the investigating officer did not cite him for intoxication. However, Byrd could not give a satisfactory explanation of why he struck plaintiff's vehicle. At the time of the trial liability was admitted and Byrd did not take the witness stand.

Plaintiff was not rendered unconscious as a result of the collision. Immediately following the accident he left his vehicle to see if anyone in the other automobile was injured. He remained at the scene of the accident some considerable length of time until his father came and took him to his parents' home in Corvallis, whereupon he went to bed. The next

day, while he and his brother were on the way to Eugene, where plaintiff was attending college, he had a lapse of memory of about an hour. He immediately went to see a doctor in Eugene whose name he does not remember. In addition to attending college, plaintiff had a part-time job clerking in a market, in which occupation he was engaged about ten hours a week. The accident occurred about two weeks before the school year was completed and he continued with his schooling and his job until the end of the school year, although he had difficulty keeping awake in class and following the lectures.

Three days after the accident plaintiff went to his family physician, Dr. Kaliher. He complained of neck and back difficulty and excessive sleepiness. Dr. Kaliher saw him five times in approximately the next three months, during which period Dr. Kaliher sent him to see a Dr. Carter, a neurological specialist, for an examination. Thereafter, in September 1969, plaintiff moved to Alaska with his parents.

Upon arrival in Alaska, plaintiff did not see a doctor for approximately a year and nine months. He then went to a Dr. Bartko, who saw him eight times over the next ten months, the last time being shortly before plaintiff returned from Alaska to Oregon the first part of April 1972 for the trial of the case. While in Alaska plaintiff went to work in a trailer assembly plant in May 1971 and worked continuously until returning to Oregon except for a month when he was having physical difficulty performing the work and another undesignated period when the plant did not operate. He has never been hospitalized; he had total medical expenses of $427; he requested no compensation for loss of wages.

Plaintiff continuously complained of back and neck difficulties, of headaches, excessive sleepiness and exhaustion. More recently he complained of lack of

taste and smell and of an area of altered skin sensation upon one of his hips. Dr. Kaliher testified that plaintiff had developed a permanent lateral curvature of the back (scoliosis) from muscle spasm on the right side of the back and that it would prevent plaintiff from engaging in anything that involved extensive lifting. The doctor further indicated that as a result of the trauma of the accident plaintiff had developed excessive sleepiness and catalepsy which were permanent and necessitated his taking a pep pill (Ritilin) the rest of his life.

As previously mentioned, Dr. Kaliher sent plaintiff for an examination by a neurological specialist, Dr. Carter. Dr. Carter died prior to the time of the first trial but the company was aware from a copy of his report that his examination had not confirmed Dr. Kaliher's diagnosis of catalepsy, and an electroencephalogram showed no evidence of brain damage. Dr. Carter's report also indicated he had found an area of spasm on the right side of plaintiff's back, but no scoliosis. This examination had been performed approximately two months after the accident.

When, approximately two years after the accident, plaintiff began to see Dr. Bartko in Alaska, tenderness in the musculature of the right side of the back was found, but no scoliosis. The doctor thought plaintiff's complaints of tiredness and sleepiness might be caused by low blood sugar and low thyroid function. He was of the opinion that plaintiff had a permanent partial disability because of his back of 10 per cent and that, although his prognosis was good, he should perform no heavy lifting.

When, about three years after the accident, plaintiff returned from Alaska for trial, the company secured its first medical examination of plaintiff. He was sent for examination by a Dr. Wilson, a neurologist. Dr. Wilson testified that plaintiff did not mani-

fest conditions which are usually associated with narcolepsy (deep sleep), but, rather, those associated with an excessive tendency toward drowsiness (hypersomnic state) which is frequently associated with psychological problems. He performed an electro-encephalogram which revealed no indication of brain damage. The physician could form no opinion concerning plaintiff's alleged loss of the senses of smell and taste because plaintiff had much nasal congestion at the time of examination. He found no abnormalities of the back and there was no scoliosis. The doctor did not attribute plaintiff's sleepiness to any head injury but, rather, was of the opinion that the accident might have induced a neurotic condition which caused the sleepiness.

Subsequent to all of the physical examinations, except Dr. Wilson's which was largely favorable to the company, and after taking depositions of plaintiff and Byrd, plaintiff's and the company's lawyers discussed the value of plaintiff's case. The prayer of the complaint was $50,000. Plaintiff's lawyer expressed an opinion that the case was worth $12,000 to $14,000 in settlement, and the company's lawyer, $6,000 or $7,000. The matter was left there because the physical examination of plaintiff by Dr. Wilson was pending. Following such examination no further discussion arose concerning the value of the claim. However, when the lawyers met a few days later at trial, plaintiff's lawyer handed the company's lawyer a letter, which stated:

> "On behalf of William W. Eastham, you are hereby notified that we will accept the sum of $50,000.00 in settlement of his demands, or the policy limits, whichever is the lesser of the two amounts.

> "We would expect that you would be able to present acceptable proof of the policy limits in the event the limits are less than $50,000.00."

The company's lawyer subsequently testified in the present case that he had thought the minimum verdict would be around $6,500 and the maximum about $15,000. Plaintiff's lawyer also testified in the present case that he would have recommended taking less than $25,000 in settlement, but he did not say how much less he would have recommended.

The record shows that both attorneys were of senior status with vast expertise in their particular fields, plaintiff's lawyer having had a lifetime of experience in representing plaintiffs in the personal injury field and defendant's lawyer having had a similar length of experience defending such cases for insurance companies.

During the trial of the present case three lawyers who were called as expert witnesses by plaintiff testified that in their opinion it was negligence and an exercise of bad faith for the insurance company not to have made a counteroffer of settlement in response to plaintiff's letter when liability had been admitted and the testimony concerning injuries was of the present consequence. There was no testimony concerning the size of a counteroffer which would have fulfilled the company's obligation of good faith, nor was there evidence of an amount less than the policy limits which plaintiff would have been willing to accept.

Plaintiff's position is that the facts present a jury question of a "gamble with its insured's [Byrd's] money by failing to respond to the plaintiff's attempt to arrive at a settlement, not by failing to pay $25,000 but by failing to make any offer whatsoever." The company's position is, of course, that the facts as a matter of law will not support a jury finding of bad faith and therefore it was entitled to a directed verdict. A lot of time has been spent both at trial and in briefing concerning that which the letter portended.

The company contends that plaintiff's letter offering to settle for the policy limits was a take-it-or-leave-it position while the plaintiff contends it was an invitation to negotiate. We see the letter as not particularly lending itself to either viewpoint, nor do we give it much significance. Plaintiff was attempting to place himself in the best possible position were he to get a judgment for more than the policy limits and secure an assignment of Byrd's potential claim to assert against the company. By so doing, plaintiff was placing himself in a stronger bargaining position if further negotiations took place. It was a usual, ordinary, and legitimate part of the "jockeying" which goes on in personal injury cases.

██ Before proceeding further it is necessary to set forth an insurer's duty to its insured where an action is filed for more than the policy limits. In *Radcliffe v. Franklin Nat'l Ins. Co.*, 208 Or 1, 38, 298 P2d 1002 (1956), this court said that "[t]he minimum which is expected of an insurer is that it employ good faith * * *." Good faith requires the insurer, in handling negotiations for settlement, to treat the conflicting interests of itself and the insured with impartiality, giving equal consideration to both interests. With respect to settlement and trial, an insurance company must, in the exercise of good faith, act as if there were no policy limits applicable to the claim and as if the risk of loss was entirely its own. Bad faith is normally demonstrated by proving that the risks of unfavorable results were out of proportion to the chances of a favorable outcome. *Radcliffe, supra* at 47. R. Keeton, Insurance Law 511, § 7.8(b) (1971).

██ In this case neither party ever made a formal offer to settle except for plaintiff's offer to settle for the policy limits, which were $25,000. It is plaintiff's position that the company was guilty of bad faith in failing to make a counteroffer to the demand for the

policy limits. He does not contend that failure to pay the policy limits, by itself, was sufficient evidence of bad faith. Plaintiff cites authorities which point to failure to attempt to settle, as differentiated from failure to pay a specific amount, as evidence of bad faith. *Daniels v. Horace Mann Mutual Insurance Company,* 422 F2d 87, 89 (4th Cir 1970); *Young v. American Casualty Company of Reading, Pa.,* 416 F2d 906, 910 (2d Cir 1969); *cert. dismissed,* 396 US 997, 90 S Ct 580, 24 L Ed 2d 490 (1970); *Rector v. Husted,* 214 Kan 230, 519 P2d 634, 643 (1974). We recognize that an insurer *may be* found to have acted in bad faith in failing to make or in unduly delaying an offer or counteroffer to settle. Also, when there is clear liability it *may be* bad faith for the insurer to refuse to settle. O'Brien, *Liability Beyond the Policy Limit,* 1955 Insurance Law Journal 525, 527. However, lack of settlement or of offer or counteroffer to settle does not necessarily constitute evidence of bad faith sufficient to submit the issue to the jury. The conduct must be considered with reference to the context in which the failure or delay occurs.

■ In this case the uncontroverted testimony establishes the maximum and minimum values that the experienced lawyers of the parties placed upon the case at a time before the verdict when they had substantially full information. The record is replete with testimony that when lawyers negotiate they start by putting the most optimistic worth on the case from their client's point of view, and then modify this evaluation as necessary to a point where the amount is still compatible with their client's interest. In so doing they sometimes reach a figure which is considered mutually advantageous. If so, the case is settled; if not, it is tried. Plaintiff's lawyer evaluated the case at $12,000 to $14,000. The company's attorney believed it to be worth $6,000 or $7,000 and testified in the present case that the maximum verdict which

reasonably could be expected was $15,000. These amounts must be taken as the reasonable extremes, with the apparent reasonable settlement value probably equidistant between the extremes. On the day of the trial the company was in possession of Dr. Wilson's medical report, which was favorable to the company's case. We do not believe that, in this posture, the jury could reasonably draw any inference of bad faith from the company's failure to make a counteroffer. Plaintiff's offer on the day of trial was more than twice that seen by experienced people as the probable settlement value. The company had a $10,000 cushion of its own money between the most optimistic evaluation of plaintiff's case and its policy limits. The company was justified in electing to try the case rather than making the gesture of extending a counteroffer. An insurance company is not required to offer to settle or face an action for bad faith in such a situation. To hold otherwise would mean that almost any case would be submitted where the recovery is in excess of the policy limits.

The testimony of plaintiff's three expert witnesses that the conduct in question here constituted bad faith carries no more weight than does testimony in a negligence case that certain acts constituted negligence. The conduct must be evaluated in the circumstances in which the company acted or failed to act. We conclude that the circumstances do not permit an inference of bad faith.

Because the facts did not warrant submission of bad faith to a jury, it is unnecessary to decide the other issues raised upon appeal.

The judgment of the trial court is reversed.

## ON PETITION FOR REHEARING

Upon respondent's petition for rehearing filed October 14, 1975,
former opinion filed September 25, 1975, 273 Or 600, 540 P2d 364,
rehearing denied November 20, 1975

# EASTHAM, *Respondent, v.* OREGON
# AUTOMOBILE INSURANCE COMPANY,
## *Appellant.*
### 542 P2d 895

C. S. Emmons, of Emmons, Kyle, Kropp & Kryger, Albany, and McMinimee and Kaufman, Tillamook, for the petitioner.

No appearance contra.

HOLMAN, J.

Plaintiff has filed a vigorous petition for rehearing. Running through the petition is the contention that the award by the jury of $50,000 in the original case of plaintiff against Byrd, the insured, forecloses consideration of the apparently reasonable settlement value of that case in determining whether there was sufficient evidence of the insurer's bad faith in the present case to go to the jury. It is this court's opinion that it is not possible to determine intelligently the issue of the insurer's bad faith without consideration of evidence bearing upon the apparent value in settlement of plaintiff's original case against the insured prior to verdict. In the present instance the evidence shows that with full knowledge of all relevant facts as they were subsequently disclosed at trial, everyone, including plaintiff's experienced lawyer, evaluated the case at much less than the policy limits.

■ The petitioner chides the court for deciding the issue on the basis of good faith with no consideration of due care. A careful reading of the leading case in Oregon, *Radcliffe v. Franklin Nat'l Ins. Co.*, 208 Or 1, 298 P2d 1002 (1956), leaves one somewhat in doubt although it appears to have adopted the criterion of good faith (as that term is used in this kind of case) in deciding whether to negotiate and/or settle. In *Kuzmanich v. United Fire and Casualty*, 242 Or 529, 532, 410 P2d 812 (1966), we said that "only a decision

McAllister and Tongue, JJ., did not participate in this decision.

made by an insurer who exercises due diligence in apprising itself of the material facts is entitled to be considered as made in good faith," citing *Radcliffe*. There is no contention in this case that defendant did not fully inform itself of the relevant facts. To the contrary, the complaint takes great care in alleging that defendant was in possession of all relevant information and, therefore, should have offered to settle. Most authorities agree there is little difference between the concepts of "good faith" and "due care" where the duty of the insurer, as we stated in our original opinion, is to "act as if there were no policy limits applicable to the claim and as if the risk of loss was entirely its own." See R. Keeton, *Liability Insurance and Responsibility for Settlement*, 67 Harv L Rev 1136, 1146-148 (1954).

■ Plaintiff is particularly concerned about the negligence aspect of the case because, as he points out, there is evidence that defendant neither made an offer nor informed Byrd of plaintiff's offer to settle for the policy limits, and contends that these are acts of negligence which necessitate a jury determination. However, as we held in the original opinion and reaffirm here, the court looks at the composite whole of all facts in deciding whether there is sufficient evidence to go to a jury. A plaintiff does not automatically get to a jury by showing there is present the kind of evidence which in some other case was considered probative of negligence or bad faith.

There is often language used in an opinion which, in retrospect, the writer wishes he had not used. Such is the case concerning the language which the writer used in the original opinion wherein he said that the evidence of plaintiff's experts to the effect that the defendant's conduct constituted bad faith "carries no more weight than does testimony in a negligence case that certain acts constituted negligence."

That language was not very informative. As plaintiff's attorney points out in his petition, in many negligence situations experts give testimony as to the level of conduct which is considered appropriate in certain circumstances with which the average individual cannot be expected to be familiar. Assuming that the ethics of insurance defense are sufficiently esoteric that the members of the court, or of the jury, may be helped by the opinions of experts on these matters, this court is not bound to follow blindly their testimony in deciding whether certain conduct can be found to be sufficiently outside of appropriate norms that it should be submitted to the jury. If it were otherwise, expert witnesses and not this court would decide what constitutes a prima facie case of bad faith.

The petition for rehearing is denied.