574 F.2d 469
 PORTLAND GENERAL ELECTRIC COMPANY, an Oregon Corporation and
Ralph Rokeby-Johnson, Underwriter at Lloyds,
London, Plaintiffs-Appellants,
v.
PACIFIC INDEMNITY COMPANY, a corporation, Defendant-Appellee.
 No. 75-1353.
 United States Court of Appeals,
Ninth Circuit.
 April 18, 1978.
Rehearing and Rehearing En Banc Denied June 2, 1978.
 
 1
 William H. Morrison (argued), of Morrison, Dunn, Cohen, Miller, & Carney, Portland, Ore., for plaintiffs-appellants.
 
 
 2
 John Gordon Gearin (argued), of Gearin, Landis & Aebi, Portland, Ore., for defendant-appellee.
 
 
 3
 Appeal from United States District Court District of Oregon.
 
 
 4
 Before GOODWIN and SNEED, Circuit Judges, and POOLE,* District judge.
 
 
 5
 POOLE, District Judge.
 
 
 6
 Appellants Portland General Electric Company (PGE) and its excess liability insurer, Ralph Rokeby-Johnson, an underwriter at Lloyds of London (Lloyds), brought action in Oregon state court against Pacific Indemnity Insurance Company (Pacific) charging it with bad faith refusal to settle a personal injury claim within the policy limits in connection with a lawsuit in which PGE was defendant. Pacific removed the action to Federal District Court on diversity grounds, and that court subsequently ruled in Pacific's favor. Appellants appealed from the judgment below on the grounds that the findings of fact were clearly erroneous and that the court's conclusions of law were unsupported by Oregon case authority. We reverse.
 
 
 7
 In the original personal injury case, the plaintiff, Harold Parker, a workman, sustained serious injuries when a pipe he was handling struck a high-voltage power line which had been installed by PGE. Parker, 49 years old, married, father of two young children, suffered the virtual destruction of both hands. He resisted amputation and endured twelve painful operations which nonetheless failed to restore more than minimal use of his hands. He sued PGE, McIntyre Electric Company (a contractor which had worked on the power line), and Clarence Owens, a subcontractor under McIntyre. The complaint sought $850,000 general damages and more than $61,000 in special damages. PGE was self-insured for $25,000. Pacific insured PGE for an additional $250,000 and Lloyds insured any excess liability over $275,000. PGE and Pacific were separately represented by counsel.
 
 
 8
 In pretrial discussions the defense attorneys and George Broatch, Pacific's claims manager for the northwest, concluded that although there was some slight possibility of a defense verdict based on contributory negligence, liability would be found with a probable verdict for plaintiff in the $100,000 to $200,000 range. The attorneys believed that a verdict in excess of $275,000 (the combined sum of PGE's $25,000 self-insurance and Pacific's $250,000) was unlikely. One PGE claims manager, however, felt that the case had a $300,000 settlement value and so advised Lloyds. Defense counsel also knew of a similar case, in the same county, during the previous year, involving another public utility which had resulted in a plaintiff's verdict of $600,000. Broatch, himself, who had exclusive authority to settle on behalf of Pacific, believed that a verdict for Parker, were liability to be established, would be not less than $170,000 and not over $240,000. He also believed that Parker would win.
 
 
 9
 Three weeks before the trial Parker offered to settle for $125,000. Broatch would go no higher than $105,000. Actually, Broatch was willing on Pacific's behalf to contribute only $75,000. PGE offered to contribute $5,000 on top of its basic liability of $25,000. Defense counsel urged Broatch to settle for $125,000, but he refused. The record shows no counteroffer.
 
 
 10
 The ensuing jury trial was a defense disaster. Parker was awarded a verdict of $701,834. Although defense counsel believed that the trial court had made several reversible errors, particularly in regard to contributory negligence, the case was settled before appeal for $459,000. This action was subsequently brought by PGE and Lloyds against Pacific on a claim of bad faith refusal to settle within the policy limits. After the federal court trial, a judgment was entered for Pacific. The District Court expressly found that there was no reasonable prospect of excess exposure beyond $250,000 and therefore concluded that Pacific had acted in good faith. Appellants challenge the District Court's findings of fact as well as its conclusions of law, and, particularly the finding of good faith. Rule 52(a), Federal Rules of Civil Procedure, provides that a judge's findings of fact will stand unless clearly erroneous.
 
 
 11
 " * * * A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); Collman v. C. I. R., 511 F.2d 1263, 1267 (9th Cir. 1975).
 
 
 12
 A trial court's rulings on questions of law, however, have less deferential protection on review. 9 Wright & Miller, Federal Practice and Procedure, § 2588, at 750 n. 44 (1971). An Appellate Court should give great weight to the determinations of state law made by a district judge experienced in the law of that state, but the parties are entitled to a review of the trial court's determinations of state law just as they are as to any other legal question in the case. Freeman v. Continental Gin Co., 381 F.2d 459, 466 (5th Cir. 1967).
 
 
 13
 The sole issue on appeal is whether the district court's finding that Pacific acted reasonably and in good faith was clearly erroneous.[1] For the reasons herein set forth we find ourselves left with the definite and firm conviction that a mistake was committed in the finding of reasonableness and good faith. We are further of the opinion that in the application to these facts of the substantive law of Oregon, which controls this diversity case, the trial court was in error.
 
 
 14
 In Radcliffe v. Franklin National Ins. Co. of New York, 208 Or. 1, 298 P.2d 1002 (1956), the Hodges, husband and wife, sued the plaintiff insured for damages for personal injuries. The wife sought $50,000 and the husband $10,000. The policy limits were $10,000 for a single insured and $20,000 for multiple insureds. On the second day of trial, the Hodges' attorney offered to settle for $10,000 in satisfaction of all claims. The defense attorney believed the case had a settlement value of between $7,500 and $8,000. The insurer made no response to this offer. The jury verdict was $21,500 of which the insurer paid $11,500, leaving the Radcliffe's to pay $10,000 for the recovery of which they sued the insurer. The trial court directed a verdict for the defendant insurer. The Supreme Court of Oregon reversed, holding that there was sufficient evidence to make a jury issue as to whether the company had shown bad faith in failing to discover certain evidence which might have revised its estimate of the value of the case and the probability of a verdict for the claimants.
 
 
 15
 Justice Rossman, who authored Radcliffe, made an exhaustive survey of the duty of a liability insurer in negotiating for settlement. After analyzing the various standards applied in other jurisdictions where an insurer rejects settlement offers, he concluded the law of Oregon to be that, "the minimum which is expected of an insurer is that it employ good faith when it disposes of settlement matters." Id. at 38, 298 P.2d at 1019. The opinion approved the holdings in Hall v. Preferred Accident Ins. Co., 204 F.2d 844, 848 (5th Cir. 1953), that " * * * a defense going far enough to show reasonable and probable cause for making it will vindicate the good faith of the insurance company." It also approved the statement found in Traders and General Ins. Co. v. Rudco Oil & Gas Co., 129 F.2d 621, 627 (10th Cir. 1942), that:
 
 
 16
 " * * * the right to control the litigation in all of its aspects carries with it the correlative duty to exercise diligence, intelligence, good faith, honest and conscientious fidelity to the common interest of the parties."
 
 
 17
 It quoted the decision in Tyger River Pine Co. v. Maryland Casualty Co., 170 S.C. 286, 292, 170 S.E. 346, 348 (1933) that the thing which an insurer undertakes to do is to hold the insured harmless in disposition of the claim and that:
 
 
 18
 "If, in the effort to do this, its own interests conflicted with those of (the insured), it was bound, under its contract of indemnity, and in good faith, to sacrifice its interests in favor of those of the (insured). * * * "
 
 
 19
 The Court also quoted the following from Dumas v. Hartford Accident & Indemnity Co., 94 N.H. 484, 56 A.2d 57, 60 (1947):
 
 
 20
 " * * * in other words, in deciding whether or not to settle the insurer must be as quick to compromise and dispose of the claim as if it itself were liable for an excess verdict. (Citations omitted). Moreover it follows from the standard of due care that the insurer cannot be too venturesome and speculate with a trial of the issues in the accident case at the risk of the insured."
 
 
 21
 In Radcliffe, the court referred to Professor Robert E. Keeton's article, "Liability Insurance and Responsibility for Settlement," 67 Harv.L.Rev. 1136 (1954):
 
 
 22
 " * * * the controlling rule should balance the risks involved and thereby cause the insurer in settlement matters to behave as if it were liable for the entire judgment that may eventually be entered. There is manifest merit in the suggestion. Keeton's recommendation has found acceptance in decisions such as Dumas v. Hartford Accident & Indemnity Co., supra, which require the insurer to be as 'quick to compromise and dispose of the claim as if it itself were liable for any excess verdict.'
 
 
 23
 "Plainly, an automobile owner who procures a policy of limited liability insurance understands that the company is in business and that unless it looks after its own interests it cannot expect to survive. The insurer, obviously, has a right to give heed to its own interests when it considers settlement offers, but when it does so it must give at least as much attention to those of the insured. The latter were entrusted to it for protection. When an accident occurs, followed by a claim asserted by the injured person, the common interests of the insured and the insurer are in jeopardy. Although the company, in dealing with the situation, has a right to consider its own interests, it has no right to sacrifice those of the insured. The decision made in such a situation must be an honest one, it must be made in good faith and with due consideration for the interests of the insured." 208 Or. at 47, 298 P.2d at 1023.
 
 
 24
 In Eastham v. Oregon Automobile Ins. Co., 273 Or. 600, 540 P.2d 364 (1975), rehearing denied, 273 Or. 610, 542 P.2d 895 (1975), the Oregon Supreme Court recently restated the duty of an insurer toward its insured where an action is filed initially demanding more than the policy limits. In that case the plaintiff alleging symptoms of narcolepsy and other stigmata claimed to be the result of an automobile accident caused by the fault of the insured, one Byrd, sued for $50,000. The policy limit was $25,000. During settlement discussions plaintiff's lawyer expressed an opinion that the case was worth $12,000 to $14,000 in settlement, while the insurer's lawyer suggested $6,000 or $7,000. The matter was left there because a physical examination of plaintiff by the insurer's expert, Dr. Wilson, was pending. That report came in a few days before trial. It was largely favorable to the defendant. There were no further discussions until the day of trial when plaintiff presented a written demand for $50,000 (the full amount of the prayer), "or the policy limits, whichever was lesser." The demand was rejected, and there was no counteroffer. A jury returned a verdict for plaintiff for $50,000.
 
 
 25
 Eastham (to whom Byrd had assigned his claim) sued the appellant insurer claiming bad faith in failing to settle or in not attempting to settle. The jury found bad faith and the insurer appealed. The appellate court reversed, holding that a directed verdict for the insurer should have been granted. The court reiterated Radcliffe's admonition that "the minimum which is expected of an insurer is that it employ good faith * * *." And it then continued:
 
 
 26
 " * * * Good faith requires the insurer, in handling negotiations for settlement, to treat the conflicting interests of itself and the insured with impartiality, giving equal consideration to both interests. With respect to settlement and trial, an insurance company must, in the exercise of good faith, act as if there were no policy limits applicable to the claim and as if the risk of loss was entirely its own. Bad faith is normally demonstrated by proving that the risks of unfavorable results were out of proportion to the chances of a favorable outcome." 273 Or. at 607, 540 P.2d at 367. (Emphasis added).
 
 
 27
 However, the court, through Justice Holman, concluded that the insurer's conduct had been well within the above standards. It noted that the offer of settlement ($25,000) was more than double the value placed on the case by plaintiff's own counsel, and was four times that of defense counsel, both conceded to be experienced. The extent and source of injury was in dispute; there was a serious issue whether plaintiff's claimed symptoms, if found to exist, were the result of trauma or stemmed from underlying neuroses. There had been a cushion of $10,000 between the most optimistic evaluation of the case (by plaintiff's counsel) and the policy limit a cushion which amounted to almost two-thirds, again, of the settlement demand. And finally, when the written demand was made for the policy limit, the insurer then had Dr. Wilson's medical report which was favorable to the defense.
 
 
 28
 The Supreme Court was of the opinion that the jury could not reasonably draw an inference of bad faith from the failure to make a counteroffer:
 
 
 29
 " * * * The company was justified in electing to try the case rather than making the gesture of extending a counteroffer. An insurance company is not required to offer to settle or face an action for bad faith in such a situation. To hold otherwise would mean that almost any case would be submitted where the recovery is in excess of the policy limits." 273 Or. at 609, 540 P.2d at 368.
 
 
 30
 In the instant case the trial court believed that the insurer could not be held to have acted in bad faith unless it "failed to settle without justification and gambled with the risk of excess liability." It also felt that there had been no "reasonable prospect of excess liability." (ROA 282). Such a view imposed a higher threshold of liability than the rulings in either Radcliffe or Eastham. The analogy to gambling is not supported by Eastham, for the court there said:
 
 
 31
 " * * * We recognize that an insurer may be found to have acted in bad faith in failing to make or in unduly delaying an offer or counter-offer to settle. Also, when there is clear liability it may be bad faith for the insurer to refuse to settle. * * *." 273 Or. at 608, 540 P.2d at 368. (Emphasis in original).
 
 
 32
 Whether such conduct is evidence of bad faith must of course be determined in context. We think that under Oregon law PGE's interest as an insured entitled it to greater protection than the standard imposed by the trial court. Having an excess carrier did not mean it had no interest in the outcome of the litigation with a corresponding right to have Pacific handle the claim in good faith. Nor does an excess carrier surrender its right to have the basic liability carrier act in good faith. Pacific was obligated, as any other fiduciary, to handle resolution of this claim with caution and consideration of all aspects of potential risk i. e., in good faith regardless of the reality that another entity bore the onus of excess liability.
 
 
 33
 Even, however, if the trial judge's simile is followed, the facts compel the conclusion that the gamble embarked upon here involved not only the risk of excess verdict but, additionally, for its logic to be explicable, it was tantamount to a bet against liability a wager at odds with all that was known. The evidence made this case most eminently one for consideration of the proffered settlement or for counteroffer because the stakes were high and the liability clear. Claims manager Broatch and the defense attorneys reached consensus that a defense verdict was unlikely; Broatch himself believed plaintiff would win. The defense consensus estimated the probable plaintiff verdict as between $100,000 and $200,000; Broatch believed a plaintiff verdict would be not less than $170,000 but not more than $240,000. A verdict in excess of $275,000 (sum of PGE's self-insurance and Pacific's coverage) was believed unlikely, although it is noteworthy that the estimate of Pacific's agent, Broatch, envisioned the possibility of a verdict within 15% of that line marking the excess.
 
 
 34
 Along with the above indicators of a substantial plaintiff's verdict, there was one PGE claims manager who stated that the case had a $300,000 settlement value, and defense counsel knew that at least one case against a public utility involving similar injuries, in the same county, within the previous year, had resulted in a verdict of $600,000. The injuries were serious, permanent and painful. The plaintiff workman, 49, in the prime of life with a wife and two children, had irretrievably lost the use of both hands. $61,000 in special damages was sought with a prayer of $850,000 as general damages. The prospective appeal to a jury for an award commensurate with the suffering and loss was direct and compelling. The offer made three weeks before trial for only $125,000 was a sum only slightly more than the bottom upon which all agreed. Acceptance would have assured the defense the very benefit which insurance signifies: a certain but reasonable purchase of protection against a contingent but potentially ruinous event. Rejection increased the risks of a verdict in the upper, rather than the lower, estimates which the defense had considered.
 
 
 35
 The considerations which make settlement prudent in many cases were lightly regarded here. Although a verdict in excess of coverage was thought "unlikely" by some, such was not impossible; and there was current history and opinion concerned about its possibility. The vagaries of jury trial notoriously confound prophecy. None expected a verdict less than the offer, yet Broatch rejected it out of hand despite counsel's urging that it be accepted. He made no counteroffer, but seemed rigidly committed to offering only the rock-bottom minimum of $100,000, although even he believed that the probable minimum verdict would be $170,000. This could make sense only if he reasonably anticipated a defense verdict which he did not. Thus, he took the risk that the verdict might be more than the maximum he had considered likely. Such a risk was completely out of proportion to the chances of a favorable outcome. In our view of these facts, that conduct was arbitrary and capricious and amounted to a breach of the insurer's duty of good faith.
 
 
 36
 The judgment of the District Court is reversed.
 
 
 
 *
 Hon. Cecil F. Poole, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 "In the case at bar I must determine whether Pacific failed to settle without justification and gambled with the risk of excess liability or whether it went to trial with a rational belief that there was a fair prospect of a verdict within its policy limits
 "Before the interests of the excess carrier are sufficient to demand settlement, however, there must be a reasonable prospect of excess liability. That prospect is absent here. Pacific reasonably concluded that this was simply not a case of excess liability and that any gambling chips involved were its own. In evaluating its approach to the $125,000 settlement offer, I am most impressed by the distance between that figure and the combined $275,000 liability limits of PGE and Pacific." ROA 282.