BOHEMIA, INC., a corporation, and Employer's Mutual Casualty Co., a corporation, Plaintiffs-Appellants Cross-Appellees,

v.

The HOME INSURANCE COMPANY, a corporation, Defendant-Appellee Cross-Appellant.

Nos. 82–3666, 82–3667.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 8, 1983.

Decided Feb. 7, 1984.

Thomas H. Tongue, Morrison, Dunn, Miller, Carney & Allen, Portland, Or., for plaintiffs-appellants cross-appellees.

J.P. Graff, Ken Roberts, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., for defendant-appellee cross-appellant.

Before FLETCHER and ALARCON, Circuit Judges, and JAMESON,* District Judge.

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

JAMESON, District Judge:

Bohemia Inc., the insured, and Employer's Mutual Casualty Co., its excess insurer, appeal from a judgment dismissing an action on a marine insurance policy against The Home Insurance Company, the primary insurer, based upon the decision of the district court that Home was neither negligent nor guilty of bad faith in its investigation of and refusal to settle a wrongful death claim against Bohemia. We affirm.

## I. Facts

On June 26, 1978, a barge and tug owned by Bohemia collided with a small boat on the Umpqua River in Oregon. Albert Balkema and his wife were fishing from the boat, and Albert drowned in the accident. His wife allegedly suffered personal injuries. Bohemia was covered by two insurance policies—a primary policy issued by Home and an excess policy by Employer's. Home immediately retained a Portland law firm to investigate the accident, and the firm assigned Clemens E. Ady to the case. Balkema's estate brought a $1 million dollar wrongful death action in state court against Bohemia. Home considered its policy limit to be $100,000 and, through Ady, offered $20,000 prior to trial and $50,000 on the first day of trial to settle the case. The estate's attorney proposed a settlement for $100,000, but the district court found that the estate at no time made a definite offer to settle within the policy limit. The case went to trial, and the jury awarded $250,000, reduced to $175,000 by Balkema's 30% contributory negligence. Home paid $100,000 less defense costs, and Employer's paid the balance including $5,000 to settle all potential claims by Mrs. Balkema personally.

## II. Proceedings in District Court

Bohemia and Employer's then brought an admiralty action against Home in federal district court under 28 U.S.C. § 1333 alleging that (1) Home's policy limit was $200,000; (2) Home owed Employer's and Bohemia the same duty of good faith and due care in its evaluation and settlement of the Balkema claims; and (3) Home breached its duty by (a) negligently evaluating the claims, (b) failing to inform Employer's of settlement progress, (c) failing to settle the claims within the primary policy limits, and (d) failing to recognize and settle Mrs. Balkema's personal claims.

The district court granted partial summary judgment on the policy limit issue, holding that the limit was $100,000. The court tried the remaining issues without a jury. In detailed findings of fact and conclusions of law the court determined that: (1) "Home owed a good faith duty to Employer's to consider Employer's interests while evaluating its settlement decisions, and a duty to balance those interests as if Home were liable for any excess judgment . . ."; (2) while Ady misjudged the settlement value of the case, neither he nor Home was negligent or acted in bad faith during their evaluation of the claims and the settlement negotiations; (3) Home owed no duty to keep Employer's informed of the progress of the case after initially notifying Employer's of the claims, absent requests from Employer's for information; and (4) Home's failure to settle Mrs. Balkema's claim before trial caused Employer's no · damage.

Employer's and Bohemia contend on appeal that each of the foregoing findings was clearly erroneous. In its cross-appeal, Home contends (1) that Bohemia and Employer's breached a duty to participate in the evaluation and defense of the claims, and (2) that Bohemia was not injured by Home's alleged negligent conduct and therefore could not subrogate a claim on which Employer's could sue.

## III. Standard of Review

With respect to the summary judgment on the policy limit issue, we conduct de novo review, viewing the evidence in the light most favorable to the losing party, to determine if the prevailing party was clearly entitled to judgment as a matter of law. *Roberts v. Elaine Powers Figure Salons, Inc.*, 708 F.2d 1476, 1478 (9 Cir.1983).

With respect to the remaining issues, in reviewing the findings of the district court we are "bound by the 'clearly erroneous' standard of Rule 52(a), Federal Rules of

Civil Procedure." *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982). Unless we are "left with the 'definite and firm condition that a mistake has been committed,' *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), [we] must accept the trial court's findings." *Id.*

### IV. *Primary Policy Limit*

■ The policy separately named and insured each of Bohemia's vessels for liability up to $100,000. The policy limited coverage "in respect to any one accident or occurrence ... to the *amount* hereby insured," which, Employer's contends, equals $200,000 since two vessels were involved—the barge and the tug. (emphasis added). As Home points out, however, Bohemia's underlying liability arises from its ownership of the negligent tugboat—not from ownership of the barge. Similarly, the policy specifically indemnified Bohemia for damages that it "shall as owners of the vessel named herein have become liable to pay...." From these provisions, Home contends, and the district court held, that policy coverage is limited to the tugboat ($100,000) since ownership of the tug is the sole source of Bohemia's liability.[1]

In concluding that the coverage was limited to $100,000 insurance on the tug, the district court relied primarily on *St. Paul Fire & Marine Insurance v. Vest Transportation Co.,* 500 F.Supp. 1365, 1372–77 (N.D. Miss.1980), *aff'd per curiam,* 666 F.2d 932 (5 Cir.1982). In *Vest* a barge being towed by a tug collided with a bridge and sank. The question arose whether the insurance policy covering the barge and tug would pay the cost of removing the sunken barge. The critical language of the policy was identical to the provisions now before us. The court held that the policy indemnified the vessel owner only for liability arising from his ownership of the insured vessel. Since liability arose solely from ownership of the tug, the policy did not cover removal of the sunken barge. The court supported its conclusion with an exhaustive review of the federal case law which, we conclude, sufficiently establishes a federal admiralty rule governing the policy provisions at issue here.

Employer's and Bohemia contend that the court erred in applying federal admiralty law rather than state law for interpreting insurance policies. They argue that *Wilburn Boat Co. v. Fireman's Fund Insurance Co.,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955) requires this court to apply state rules for construing contracts in the absence of a controlling federal rule.[2]

In *Kalmbach, Inc. v. Insurance Co. of Pennsylvania,* 529 F.2d 552, 554–55 (9 Cir. 1976), we observed that "[w]hether federal or local law applies to a maritime insurance contract can present a troublesome question." There we applied state law "because both parties urge us to do so and because there is no statutory or judicially established federal admiralty rule governing the provisions in question." *Id.* Similarly, when we considered an equal protection attack on a state statute affecting marine indemnity policies, we noted that "this matter is not substantively governed by a federal admiralty rule, and that state law therefore applies to the regulation of marine insurance indemnity contracts."

---

1. The district court noted that the "barge was not at fault" and "Bohemia's liability as owner of the tug does not trigger coverage on the barge."

2. State rules of construction do not differ significantly from those applied in most admiralty courts. Compare *First Far West Transportation v. Carolina Casualty Insurance Co.,* 47 Or.App. 339, 614 P.2d 1187, 1190 (1980) (ambiguities in insurance policy construed against insurer) *with Navieros Oceanikos v. S.T. Mobil Trader,* 554 F.2d 43, 47 (2 Cir.1977) (ambiguities in maritime contract construed against drafter).

Employer's argued to the district court that the policy is ambiguous and ought to be construed against the insurer. The district court implicitly rejected this contention by relying on *Vest Transportation Co., supra,* in which the court considered identical provisions of a marine indemnity policy and concluded they "leave no room for doubt or ambiguity as to who is insured, in what capacity he is insured, and for which losses he will be indemnified." 500 F.Supp. at 1374.

*Ahmed v. American Steamship Mutual Protection & Indemnity Assoc.,* 640 F.2d 993, 996 (9 Cir.1981) (dictum), *cert. denied,* —— U.S. ——, 104 S.Ct. 98, 78 L.Ed.2d 103 (1983).[3] Our decisions rely on *Wilburn Boat Co., supra,* 348 U.S. at 313–14, 75 S.Ct. at 370, and *Kossick v. United Fruit Co.,* 365 U.S. 731, 741–42, 81 S.Ct. 886, 893–94, 6 L.Ed.2d 56 (1961) which, when read together, hold that state law will control the interpretation of a marine insurance policy only in the absence of a federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice. As noted above, we conclude that a federal admiralty rule governs the policy provisions at issue here. We therefore affirm the district court's summary judgment setting the policy limit at $100,000.

### V. Negligence in Evaluating and Processing Claim

■ The district court found that neither Home nor its attorney was negligent in "evaluating, handling, and processing" the Balkema claim. We conclude that this finding is not clearly erroneous and is supported by substantial evidence.

Employer's and Bohemia rely on *Portland Electric Co. v. Pacific Indemnity Co.,* 574 F.2d 469, 474 (9 Cir.1978) and *Rova Farms Resort v. Investors Ins. Co. of Amer.,* 323 A.2d 495, 65 N.J. 474 (1974) in support of their contentions that the district court erred in its findings that Home did not act negligently or in bad faith. In *Portland Electric* we mentioned as factors which should be considered during the evaluation of a claim: (1) potential for a plaintiff's verdict exceeding primary coverage; (2) elements and extent of loss; (3) jury appeal of parties, witnesses, and the case; and (4) local verdict history. 574 F.2d at 474.

After receiving expert testimony at trial, the district court found "the reasonable settlement value of this case was between $75,000 and $125,000." Ady, Home's attorney, evaluated the case at $20,000, but the court held that "to misjudge the settlement value of a claim" is not negligence. "When an attorney had diligently gathered all necessary information," the court reasoned, "and has made a good faith pretrial evaluation of the settlement value of that claim, he cannot be deemed negligent simply because that evaluation is wrong." Accord, *North River Insurance Co. v. St. Paul Fire & Marine Insurance Co.,* 600 F.2d 721, 724 (8 Cir.1979) (interpreting South Dakota law).

We find substantial evidence in the record to support the district court's finding that Ady "promptly and diligently investigated and evaluated the claim, and at all times handled the litigation in a competent and professional manner." It is also clear that Ady considered all the factors set out in *Portland General Electric, supra.* On June 26, 1978, the day of the accident, Ady investigated the accident site and on July 7 sent a six page report to Home, including photographs of the site. The report expressed Ady's belief that Home risked "substantial exposure in this case" based on the following conclusions drawn from his investigation: (1) the skipper of the tug "was negligent in failing to post a lookout on the bow of the barge, especially where the channel is so close to the shore and around a blind corner"; (2) the skipper not only was "negligent for failing to climb the [elevated navigation] platform," but in fact was relieving himself over the side when the accident occurred; (3) Bohemia was also "negligent in failing to provide adequate controls on the elevated platform ..."; (4) the skipper "makes a rather poor appearance as a witness but is rather articulate...." Ady also concluded, however, that the Balkemas were contributorily negligent for being on the river without life jackets, anchored in a commercial channel frequented by tugs and barges, and obscured by a bend in the river. Ady also reported interviewing a witness to

---

**3.** *Cf. Nordeutscher Lloyd v. Jones Stevedoring Co.,* 490 F.2d 648, 649 (9 Cir.1973) (stevedoring indemnity policy is maritime in nature and controlled by federal, not state law). Some circuits hold as a general rule that interpretation of marine insurance policies is governed by federal law. See, *e.g., Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 332 (5 Cir.1981); *Navieros Oceanikos v. S.T. Mobil Trader,* 554 F.2d 43, 47 (2 Cir.1977).

the accident who was sympathetic to the Bohemia. Ady finally advised Home to set up a reserve of $45,000 to $50,000.

Ady issued a second report on March 30, 1979, after most of the depositions were completed. He assessed the witnesses' appeal and reviewed the facts, concluding that negligence would "probably be weighted against Bohemia ... in that they are a large company and are obviously target defendants." Ady also noted that damages were particularly difficult to predict because lost support was minimal, and damages consisted almost solely of love and affection lost to Balkema's five adult children. "It is not unlikely," Ady reported, "that we could obtain a settlement in the area of $30,000. However, it is our opinion that the likelihood of receiving an extremely large verdict is not there." Ady recommended settlement "in the neighborhood of $20,000."

The parties agree that the district court misread part of Ady's March 30 report. In the report, Ady stated that federal maritime law and its "pure" comparative negligence provisions would apply to the case, thus assuring the estate of a recovery regardless of the contributory negligence assigned to Balkema. The district court erroneously found, however, that Ady suggested "settlement in the area of $20,000 would probably be reasonable because under Oregon law if the Balkema's were more than 50% negligent they could recover nothing."

While the parties agree that this finding is clearly erroneous, they disagree on the effect the error had on the district court's finding that neither Ady nor Home negligently evaluated the case. Employer's speculates that the court considered Ady's

evaluation of the case non-negligent because it erroneously believed a defense verdict was possible. We need not speculate with Employer's since we may affirm the district court on the basis of any record evidence that supports its judgment. *Southwestern Publishing Co. v. Simons,* 651 F.2d 653, 656 n. 2 (9 Cir.), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1981). The evidence we have reviewed amply supports the court's finding, notwithstanding its misreading of Ady's report,[4] that Ady "promptly and diligently investigated and evaluated the claim. . . ."

The court also found that insurers often "must place substantial reliance on local counsel" in evaluating a case,[5] and that Home, having retained competent counsel, was entitled to rely on his non-negligent evaluation. We agree. Furthermore, while Ady diligently gathered and reported all the necessary information to Home, it is also clear, as the district court found, that "Home responded to the information it received in a prompt and diligent manner, and it actively sought periodic reports." There is no evidence here of negligence arising from the insurer's "bureaucratic bungling and assembly-line inefficiency." Cf. *Robertson v. Hartford Accident & Indemnity Co.,* 333 F.Supp. 739, 742 (D.Or. 1970); *O'Keefe v. Safeco Insurance Co.,* 55 Or.App. 811, 639 P.2d 1312, 1314–15 (1982). The district court's finding that Home was not negligent was not clearly erroneous.

VI. *Good Faith in Evaluating and Failure to Settle the Claim*

▆ It is well settled in Oregon that the insurer owes its insured a duty to exercise good faith in evaluating and settling a

4. The court placed no apparent weight on its erroneous finding in succeeding findings and conclusions. The court further noted that Ady anticipated a plaintiff's verdict well below the policy limits. We may infer as well that the high settlement value set by the court does not reflect a serious belief in the possibility of a defense verdict.

5. The court correctly observed that "[m]uch of the information needed to formulate settlement strategy, such as local jury verdict history in similar cases, local perception of the defendant,

the competence of opposing counsel, knowledge of the trial judge, and so on, must come from the local defense counsel." In fact, insurers are sometimes negligent in ignoring the advice of competent counsel. Compare *Robertson v. Hartford Accident & Indemnity Co.,* 333 F.Supp. 739, 740 (D.Or.1970) (attorney recommended prompt settlement, insurer refused) with *Allen v. Allstate Insurance Co.,* 656 F.2d 487, 489 (9 Cir.1981) (insurer's reliance on attorney was "wishful thinking").

claim. *Portland General Electric, supra,* 574 F.2d at 473; *Eastham v. Oregon Auto Insurance Co.,* 273 Or. 600, 540 P.2d 364, 367, *reh'g denied,* 273 Or. 610, 542 P.2d 895 (1975); *Radcliffe v. Franklin National Insurance Co.,* 208 Or. 1, 298 P.2d 1002, 1020 (1956); *Kriz v. Government Employees Insurance Co.,* 42 Or.App. 339, 600 P.2d 496, 500 (1979). We held in *Portland General Electric, supra,* 574 F.2d at 473, that the excess insurer also has a "right to have [the primary insurer] act in good faith." See also *Maine Bonding & Casualty Co. v. Centennial Insurance Co.,* 64 Or.App. 97, 667 P.2d 548 (1983) (court assumed but expressly refused to decide that primary insurer owed good faith duty to excess insurer). We later explained the origin of the excess insurer's "right" in *Portland General Electric, Co., v. Pacific Indemnity Co.,* 579 F.2d 514, 516 (9 Cir.1978):

> We think that the Oregon court would follow the Minnesota court [in *Continental Casualty Co. v. Reserve Insurance Co.,* 307 Minn. 5, 238 N.W.2d 862 (1979)] and our interpretation of California law [in *Valentine v. Aetna Insurance Co.,* 564 F.2d 292, 296–98 (9 Cir.1977)] and hold that [the excess insurer] was subrogated to all of PGE's rights if PGE had not had an excess carrier.

(citing *Groce v. Fidelity General Insurance Co.,* 252 Or. 296, 298, 448 P.2d 554, 557 (1968)). Since the Oregon court still has not faced this question, we continue to follow the foregoing reasoning and hold that Employer's acquired by equitable subrogation whatever rights Bohemia might have had against Home for breach of its duty of good faith.

■ The district court held that Home owed a good faith duty "to consider Employer's interests while evaluating its settlement decisions, and a duty to balance those interests as if Home were liable for any excess judgment over the policy limit."

This is an accurate statement of the good faith duty as applied in Oregon. See *Eastham v. Oregon Auto Insurance Co., supra,* 273 Or. 600, 540 P.2d at 367.[6] In concluding that Home did not breach its duty, the district court relied on four specific findings: (1) "at no time did the estate actually present Home with a definite offer to settle within the policy limit"; (2) even if Home had offered its policy limit, it was not clear the estate would have accepted; (3) "Home's possible gain by not settling was not grossly disproportionately small compared to the risk to the excess insurer"; and (4) Home's reliance on the advice of its counsel was evidence of good faith. Employer's attacks these findings as clearly erroneous and additionally contends that Home failed to consider Employer's interests in the settlement negotiations.

■ The district court correctly noted that a firm settlement offer "is not a prerequisite to recovery in every case" but is an important factor in determining whether the insurer refused in bad faith to settle a claim within its policy limits. Compare *Baton v. Transamerica Insurance Co.,* 584 F.2d 907, 913 (9 Cir.1978), with *Maine Bonding & Casualty Co. v. Centennial Insurance Co., supra,* 64 Or.App. at 101–02, 667 P.2d at 550–51. The court considered conflicting testimony on this point: Ady repeatedly reported receiving an "offer" to settle for $100,000; but testimony at trial suggested that the offers were not firm proposals but merely the attorneys' opinions on what amount might settle the case. The testimony of the estate's attorney also supports the court's uncertainty over whether the estate would have accepted the policy limit had it been offered. The attorney felt "quite certain" that such an offer would have been accepted, but he added that his opinion was at best "an educated guess" and that the estate's personal representative, the decedent's son, "frankly wanted to go to trial."[7]

---

6. We emphasize, however, that Home did not owe an independent duty to Employer's but rather a single duty to Bohemia whose rights, if any, Employer's acquired through equitable subrogation. See, *e.g., Valentine v. Aetna Insurance Co., supra,* 564 F.2d at 298; *Peter v.*

*Travelers Insurance Co.,* 375 F.Supp. 1347, 1350 (C.D.Cal.1974).

7. It is significant also that under the indemnity policy defense costs were paid before applying the balance to satisfy the claim. Thus once a

Given the conflicting evidence, the district court's finding is not clearly erroneous.

■ The third finding derives from a test set out in *Eastham, supra,* 540 P.2d at 367: "Bad faith is normally demonstrated by proving that the risks of unfavorable results were out of proportion to the chances of a favorable outcome." Here the court found that the possibility of a favorable result "was not grossly disproportionately small compared to the risk to the excess insurer." Although the district court perhaps framed the test too leniently, the record sufficiently supports a finding that the relative risks were not "out of proportion". Having established a reserve of $50,-000, Home offered $20,000 and reasonably relied on its counsel's opinion that a verdict exceeding the policy limit was highly unlikely. The evidence indicates that Home reasonably believed the risk to Employer's was minimal.[8] The facts of this case are distinguishable from those in *Portland General Electric, supra,* where the primary insurer clearly perceived but ignored the almost certain risks to the excess insurer.

■ The court also found that Home's reliance on Ady's advice was evidence of good faith. We agree that when an insurer reasonably relies on a diligent, good faith evaluation by its counsel, the court may treat such reliance as evidence of the insurer's good faith.

Finally, Employer's contends that Home failed to consider the interests of the insured and excess insurer by refusing to offer its policy limit and "sacrifice its own interest in favor of its insured." The Oregon court in *Eastham, supra,* 273 Or. at 608, 540 P.2d at 368, recognized that:

> an insurer *may be* found to have acted in bad faith in failing to make or in unduly delaying an offer or counteroffer to settle. Also, when there is clear liability it

*may be* bad faith for the insurer to refuse to settle.

(emphasis in original)

In *Eastham* the policy limit was $25,000. The insurer's attorney evaluated the claim at $6,000 or $7,000 and testified that the maximum verdict which could reasonably be expected was $15,000. Plaintiff's attorney evaluated the claim at $12,000 to $14,-000. Neither party ever made a formal offer to settle except for plaintiff's offer to settle for the policy limit of $25,000. Plaintiff contended that the insurer was guilty of bad faith in failing to make a counteroffer to the demand for the policy limit. The jury awarded $50,000. Finding insufficient evidence to submit the question of bad faith to a jury, the *Eastham* court held that "the company was justified in electing to try the case rather than making the gesture of extending a counteroffer." *Id.*

■ While plaintiff's modest evaluation of his own case distinguishes *Eastham* from the facts in this case, we are still left with a case where the parties were widely divided based on their good faith evaluations of the claim. As the *Eastham* court observed, the parties "sometimes reach a figure which is considered mutually advantageous. If so, the case is settled; if not, it is tried." *Id.* So here, having found that Home conducted a non-negligent, good faith evaluation of its case, the district court was justified in finding that Home did not breach its duty of good faith in failing to settle prior to trial.

## VII. *Duty to Inform Excess Insurer*

The district court found (1) that Home notified Employer's that the Balkema claim might affect their excess policy and (2) that such notice was all "Home was required to provide Employer's absent further requests for information by Employer's." The court

---

defense was undertaken, the exact policy limit was no longer available, and as the defense continued, the amount available for settlement continued to diminish.

**8.** Home raised its offer to $50,000 when a juror gave damaging answers during voir dire. The court found that when that offer was rejected

Ady intended to seek authority for $75,000 but was advised that the estate wanted to proceed to trial. As the Oregon court held in *Eastham,* "The conduct must be evaluated in the circumstances in which the company acted or failed to act." *Eastham, supra,* 273 Or. at 608, 540 P.2d at 368.

further concluded as a matter of law that "Home was under no duty to keep Employer's informed of the progress of the litigation ... after Home initially informed Employer's of the existence of the litigation, absent any requests by Employer's for such information." Employer's contends that the district court's statement of law is wrong and based on clearly erroneous findings. We disagree.

Home communicated at least three times with Employer's prior to trial, each time through its agent, Gene Sause & Co., who was also Employer's broker. In September of 1978 Sause sent Employer's a complete copy of the file, notifying Employer's that the claim might involve its excess policy; Sause updated the file in January of 1979; finally, while negotiating renewal of Bohemia's excess policy, Sause suggested that the claim would probably be settled within Home's policy limits.[9] Employer's at no time prior to trial requested information nor was Employer's ever denied information. The parties apparently agree, however, that Home, through Ady and Sause, kept Bohemia adequately informed of the progress of the litigation.

 It is undisputed that Employer's was entitled to notice of the claim against its insured Bohemia. Its policy specifically required that Bohemia, "upon knowledge of any occurrence likely to give rise to a claim hereunder, shall give immediate written notice thereof to the Company." Employer's received such notice and more. Appellants contend, however, that in addition to notice of the accident and claim, Home owed an independent duty to Employer's to keep

Employer's advised as to the progress of the case, settlement negotiations, and trial date.[10] We reject this contention for two reasons. First, as against Home we have decided that Employer's acquired whatever rights Bohemia had and nothing more. Home owed a clear duty to inform Bohemia of significant developments in the case. See *Radcliffe v. Franklin National Insurance Co., supra,* 208 Or. 1, 298 P.2d at 1024; *Young v. American Casualty Co.,* 416 F.2d 906, 910 (2 Cir.1969), (applying New York law) *cert. dismissed sub nom. Myles v. Procunier,* 396 U.S. 997, 90 S.Ct. 580, 24 L.Ed.2d 490 (1970). Home did not breach its duty to Bohemia, and Employer's therefore has no claim against Home for failure to inform Bohemia. Second, the considerations requiring Home to inform its insured do not require equal treatment of the excess insurer. The insured is generally ignorant of insurance practices and legal procedure; he has a contract with the insurer under which he usually relinquishes his rights to select and control counsel and negotiate a settlement. The excess insurer, however, is well versed in insurance and legal practice and retains independent legal representation; it relinquishes no rights, has no contract with the primary insurer, and usually, as here, reserves the right to participate with the primary insurer in the control and defense of the claim. Under such circumstances, if Employer's desired information about the progress of litigation, it had the right to request it and should have done so. The district court was correct in holding that "Home was under no duty to keep Employer's informed on the progress of the litigation ... after Home

---

**9.** The district court erroneously found that Alex Parks, Ady's senior partner, negotiated the renewal and advised Employer's to set up a $50,000 reserve to cover the claim. The parties agree that Doug Parks, Alex's son, negotiated the renewal while working for Sause and did not recommend creating a reserve. Although clearly erroneous, the court's finding neither belies its other related findings nor undermines its conclusion of law.

Employer's argues that it was misled by Sause's suggestion that the case would likely be settled. We do not think the insurance agent's opinion was so misleading as to relieve

Employer's of all obligation to seek confirmation from the Home itself, to request further information from its insured, or to actually join in the defense in order to protect its interests.

**10.** Employer's policy provided that it shall have the right and be given the opportunity to associate with the assured and primary carrier "in the defense and control of any claim, suit or proceeding which involves or appears likely to involve the Company." Although fully advised regarding the accident and claim, Employer's made no request to participate in the defense of the claim.

initially informed Employer's of the existence of the litigation absent any requests by Employer's for such information."

### VIII. Failure to Settle Personal Injury Claim

■ Mrs. Balkema did not file suit for personal injuries, but Employer's settled her potential claim for $5,000 and contends that Home's failure to recognize and settle the claim caused Employer's $5,000 damage. The district court, assuming that Home was negligent in failing to act upon Mrs. Balkema's claim, found no injury to Employer's. A payment by Home on this claim would simply have reduced the amount available under the primary policy and increased by that amount Employer's excess payment on the judgment. Given the court's findings that Home did not act in bad faith by refusing to settle the wrongful death claim and that Employer's was liable for the excess judgment in any event, we agree that settlement of Mrs. Balkema's claim would not have altered the sum Employer's ultimately paid to discharge its liability.

### IX. Contentions on Cross-Appeal

Home first contends that the district court erred in failing to find appellants negligent by reason of their failure to participate in the investigation, evaluation and defense of the Balkema claim. Having decided the case on other grounds, the district court did not consider this contention, and we see no need to address it here.

■ Home next contends that it was not required to defend against the Balkema claim under the terms of the Bohemia policy, and, therefore, "it cannot be charged with a non-delegable duty to defend" in good faith. This contention is simply moot because Home *did* undertake Bohemia's defense; and under its policy Home reserved the right to control the legal proceedings:

> The right to control the litigation in all of its aspects carries with it the correlative duty to exercise diligence, intelligence, good faith, honest and conscientious fidelity to the common interests of the parties.

*Radcliffe, supra,* 208 Or. 1, 298 P.2d at 1020 (quoting *Traders & General Insurance Co. v. Rudco Oil,* 129 F.2d 621, 627 (10 Cir. 1942)).

■ Finally, Home contends that the insured must suffer some damage before the excess insurer acquires a cause of action by subrogation. Because Bohemia was indemnified by its excess insurer, Home argues, it suffered no damage. We dismissed the same contention in *Valentine v. Aetna Insurance Co.,* 564 F.2d 292, 296–97 (9 Cir. 1977) (applying California law), observing that equitable subrogation permits the excess insurer to assume the position of the insured as if he lacked excess coverage. Standing in Bohemia's position under such circumstances, Employer's damages would have been clear had it proved Home negligent or guilty of bad faith.

### X. Conclusion

We conclude that the district court properly held in granting partial summary judgment that the policy limit was $100,000, and that the court did not err in finding, following trial, that (1) neither Home nor Ady was negligent or acted in bad faith in evaluating, investigating, or processing the wrongful death claim; (2) Home did not act in bad faith in refusing to settle the claim within its policy limits; (3) Home owed no duty to inform Employer's of the progress of the litigation after initially notifying it of the existence of the litigation with all essential information, absent requests by Employer's for further information; and (4) Home's failure to recognize and settle the personal injury claim did not cause Employer's any damage. We, therefore, affirm the judgment of the district court.